SOUTH PORTO RICO SUGAR Co., peticionaria, *v.* JUNTA AZUCA-RERA DE PUERTO RICO, demandada; ADRIANA L. MERCADO PARRA, interventora.

Número 34.

*Sometido:* 22 de abril de 1960. *Resuelto:* 6 de junio de 1961.

848

*James R. Beverley, R. Castro Fernández* y *Francisco Castro Amy,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la recurrida; *Pedro M. Porrata, Charles Cupril Oppenheimer* y *José Trías Monge,* abogados de la interventora.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Se nos plantea de nuevo una controversia relativa a las solicitudes de cambio de molienda de cañas en la industria azucarera. En 1956 el colono Santiago Sambolín Becchi firmó un contrato de refacción y molienda de cañas con la South Porto Rico Sugar Co. comprometiéndose a moler las cañas de sus treinta fincas durante los años 1956 a 1960, ambos inclusive, en la Central Guánica, propiedad de la antedicha corporación. A cambio, ésta se obligó a prestarle anualmente $3.00 por cada tonelada de cañas de cuota para la siembra y cultivo de ciertas fincas, $2.50 para las demás fincas, y $3.00 por tonelada de cañas de cuota para corte y tiro de las cañas producidas en todas las fincas. La cláusula 17 del contrato proveía lo siguiente:

"Queda entendido por las partes que la Central ha convenido en refaccionar al Colono en la forma antes expuesta en consideración a la obligación contraida por el Colono de vender y entregar a la Central las cañas producidas en las fincas descritas en esta escritura durante el término total de este contrato, y no se entenderá que el Colono queda relevado de dicha obligación por el hecho de haber pagado o no adeudar préstamos refaccionarios a la Central."

El contrato fue debidamente inscrito en el Registro de Contratos Agrícolas.

En la misma fecha las partes firmaron un contrato privado por el cual "y en consideración adicional" a las ya descritas obligaciones del colono, la peticionaria convino en pagarle una compensación de veinte centavos por cada tonelada de cañas "nobles" entregadas a la peticionaria durante las cinco zafras. [1] La peticionaria prestó al colono la suma de $40,000 para la zafra de 1957 y le pagó en ese año la compensación adicional ya descrita.

En 1957 Sambolín le arrendó sus fincas a Adriana L. Mercado por un término de veinte años con opción a diez más y le informó a ésta de las obligaciones contraidas por él en el contrato de refacción. A la fecha del arrendamiento Sambolín no le adeudaba nada a la South Porto Rico Sugar Co. Le había pagado en cañas su deuda refaccionaria hasta la fecha.

Ese mismo año la nueva colono sometió un escrito a la Junta Azucarera solicitando se le permitiera cambiar la molienda de las cañas producidas en las fincas arrendadas, de la Central Guánica a la Central Rufina, propiedad ésta de Mario Mercado e Hijos, S. en C. A esa solicitud se opuso la South Porto Rico Sugar Co. en razón del contrato que había firmado con Sambolín. Luego de los procedimientos usuales y con la participación de todos los interesados, la

---

[1] Ni el contrato ni ninguna otra prueba aclaran si se trata o no de una compensación adicional a las provistas por la Ley Azucarera. La Junta no resolvió la cuestión y las partes discrepan en sus interpretaciones.

Junta dictó resolución aprobando el cambio de molienda, por las siguientes razones: 1. el colono Sambolín no le adeudaba nada a la peticionaria ni ésta le había hecho anticipo alguno para la zafra de 1958; 2. en esa situación y conforme a lo resuelto por ella y por este Tribunal en *Central San Vicente, Inc.* v. *Junta Azucarera* (Recurso de Revisión Núm. 12, Opinión *Per Curiam* del 27 de enero de 1956) y en *Mayagüez Sugar Co.* v. *Junta Azucarera*, 79 D.P.R. 423 (1956), no perdura la obligación contraida por Sambolín de moler las cañas en Central Guánica; y 3. el art. 4 (7) del Reglamento de la Junta (5 R. & R.P.R. sec. 391-4) no impide que se autorice el cambio.

Luego del consabido trámite de reconsideración, South Porto Rico Sugar Co. interpuso recurso de revisión ante este Tribunal y expedimos el auto correspondiente. Más tarde, y con la anuencia de todas las partes y la prestación de una fianza por la peticionaria para responder de posibles daños, suspendimos la resolución de la Junta.

 Antes de discutir en detalles los planteamientos de la peticionaria debemos examinar la ley aplicable y la jurisprudencia interpretativa. Provee el art. 3 de la Ley Azucarera (Ley Núm. 426 de 13 de mayo de 1951, *Leyes*, pág. 1139, 5 L.P.R.A. secs. 371-405) :

"Ninguna central azucarera podrá negarse a moler las cañas de un colono o sus sucesores o causahabientes, que hubiere sido colono de dicha central en cualesquiera de los tres (3) años anteriores a la fecha en que ofrezca dichas cañas para ser molidas, y la central deberá darle preferencia a éstos, para moler sus cañas, sobre los nuevos colonos; *Disponiéndose,* que en aquellos casos en que un colono hubiere sido colono de dos o más centrales, la obligación de la central será moler la parte proporcional de la cosecha que dicho colono entregó a dicha central para ser molida durante el último año en que fue colono de la misma.

"Para que un colono tenga derecho a cambiar de la central donde muele sus cañas a otra central, vendrá obligado a notificar a las centrales afectadas su intención de hacer dicho cambio

no más tarde del día 1 de noviembre anterior a la zafra en que intente hacer dicho cambio.

"La central vendrá obligada a moler las cañas de los nuevos colonos, a menos que la Junta exima a la central de tal obligación luego de haberse demostrado ante la Junta que la central carece de suficiente capacidad para asumir la molienda de las cañas de dichos colonos." (5 L.P.R.A. sec. 372.)

Y el art. 21 añade:

"En adición a los precedentes poderes expresamente enumerados, la Junta tendrá autoridad para dictar aquellas reglas y reglamentos que no sean incompatibles con los términos de esta Ley para la mejor ejecución de la misma, y será su deber hacer cumplir, ejecutar y llevar a cabo, por medio de sus órdenes, providencias, reglamentos o de otro modo, todas las disposiciones de esta Ley y la completa intención de las mismas; y tendrá el poder de rescindir o modificar dichas órdenes, providencias o reglamentos." (5 L.P.R.A. sec. 390.)

Interpretando el citado art. 3 hemos resuelto que: 1. es válida una orden de la Junta autorizando un cambio de molienda aun cuando el colono hubiese firmado un contrato de molienda obligándose a moler sus cañas "en lo sucesivo" en una central y ésta se opusiese al cambio—*Central San Vicente, Inc.* v. *Junta Azucarera*, 78 D.P.R. 799 (1955); 2. es igualmente válida esa orden dictada antes del vencimiento de un contrato exclusivamente de molienda, de dos años de duración, y en el cual la única ayuda que la central se compromete a facilitar al colono es un anticipo para corte y tiro, por tonelada de caña que entregue el colono a la central, el cual contrato, además, es nulo porque contiene provisiones contrarias a la Ley Azucarera—*Mayagüez Sugar Co., Inc.* v. *Junta Azucarera*, 78 D.P.R. 887 (1956); Cf. *Mayagüez Sugar Co., Inc.* v. *Junta Azucarera*, 79 D.P.R. 423 (1956); y 3. es también válida esa orden cuando se trata de un contrato de refacción y molienda en el cual las partes incorporaron expresamente "todas las reglas y disposiciones de la Ley creando la Junta Azucarera" y, por consiguiente, reconocieron el derecho del colono a cambiar de central pre-

vio el cumplimiento del requisito de aviso—*Central San Vicente, Inc.* v. *Junta Azucarera*, Recurso de Revisión Núm. 12, Opinión *Per Curiam* de 27 de enero de 1956.

La peticionaria ante nos sostiene que: 1. se trata en este caso de un contrato de refacción y molienda; 2. en vista de la obligación expresa contenida en la cláusula decimoséptima del contrato, no tiene importancia que el colono hubiese pagado su deuda, porque aún quedaba incumplida "su obligación principal de moler en Central Guánica durante el resto de las zafras cubiertas por el contrato, obligación ésta que indujo precisamente a la Central a obligarse a refaccionarlo durante todas las zafras contractuales"; 3. el caso de *Central San Vicente*, supra es inaplicable porque en dicho caso se trataba de un contrato al cual se habían incorporado expresamente las disposiciones de la Ley Azucarera, mientras que en el caso presente no hay tal compromiso; 4. el art. 3 de la Ley Azucarera no tiene otro alcance que reconocerle al colono el derecho de escoger la central que ha de moler sus cañas y no prohibe que el colono negocie ese derecho por más de un año; 5. no hay ninguna otra disposición de la citada ley que prohiba contratos de molienda por más de un año ni tampoco expresa el art. 3 que el derecho a cambiar de central sea irrenunciable; 6. no hay interés o política públicos que impidan la contratación de molienda por más de un año y, por el contrario, tales contratos constituyen una expresión de la libertad de contratación del colono; 7. los colonos no están en desventaja al firmar contratos de refacción y molienda con las centrales, porque éstas tienen la obligación legal de molerles sus cañas y de pagarles la debida compensación; 8. los contratos de refacción gozan de una especial protección legislativa dirigida a lograr nuevas fuentes de crédito para los colonos; 9. la ley aplicable a esos contratos autoriza su otorgamiento por períodos mayores de un año, les brinda protección registral, extiende dicha protección a los contratos de molienda de cañas, provee para

el cumplimiento específico de dichos contratos y a esos fines concede el remedio extraordinario de *injunction;* 10. la Junta adopta posiciones contradictorias cuando niega el cambio de molienda si el colono no ha saldado su deuda refaccionaria y lo permite cuando la ha pagado en su totalidad.

Estos hábiles y juiciosos planteamientos necesariamente nos obligan a hacer un concienzudo reexamen de toda esta situación y a establecer con la mayor claridad posible las normas que deben regirla.

La letra del art. 3 arroja una luz muy vacilante sobre el asunto. Exige a las centrales la obligación de moler las cañas de aquellas personas que hubiesen sido sus colonos durante cualquiera de los tres años anteriores, con una disposición especial para las otras personas que hubiesen sido colonos de dos o más centrales, y, además, la obligación de moler las cañas de los nuevos colonos, a menos que por falta de suficiente capacidad la Junta Azucarera las exima de ese deber. En cuanto a los colonos sólo dice lo siguiente: "Para que un colono tenga derecho a cambiar de la central donde muele sus cañas a otra central, vendrá obligado a notificar a las centrales afectadas su intención de hacer dicho cambio no más tarde del día 1 de noviembre anterior a la zafra en que intente hacer dicho cambio." Esta disposición sólo aclara que el colono tiene derecho a hacer cambios de molienda(²) y que si decide hacerlos debe avisar a las centrales afectadas, pero por sí sola no resuelve si ese derecho puede ser objeto de contratación y en cuáles circunstancias. Tampoco ayuda en este asunto el historial legislativo de la Ley Azucarera, el cual hemos examinado detenidamente.

---

(²) "Sabido es que dicho artículo volvió a restablecer la libre contratación entre centrales y colonos fuera del plan original de zonas de producción determinadas por la Comisión de Servicio Público, que contenía el art. 4 de la Ley Núm. 221 de 12 de mayo de 1942, según enmendado por la Ley Núm. 383 de 15 de mayo de 1949, y reglamentado por el Reglamento sobre Compañías Azucareras aprobado por la Comisión de Servicio Público el 29 de junio de 1946." *Mayagüez Sugar Co., Inc.* v. *Junta Azucarera,* 79 D.P.R. 423, 424.

La experiencia de los administradores de la Ley es mucho más útil. Desde sus comienzos la Junta Azucarera se enfrentó a estos problemas. Dispuso en su Reglamento (5 R. & R.P.R. sec. 391–4) que las notificaciones exigidas por el art. 3 de la Ley deberían hacerse por escrito y a través de la Junta, los datos que en ellas deberían aportarse, la manera de enviarlas, el procedimiento para someter y resolver las oposiciones, y los trámites a observarse por los nuevos colonos y por los nuevos poseedores. Como último párrafo del artículo se incluyó lo siguiente:

"Nada de lo contenido en los párrafos precedentes deberá interpretarse en forma alguna que restrinja, modifique o menoscabe cualquier derecho adquirido en contratos de refacción y molienda debidamente legalizados o en contratos de otra índole que se relacionen con la molienda de las cañas del colono por la central, siempre que dichos contratos no estén en contravención con las disposiciones de la Ley Azucarera."

En ese párrafo la Junta sin duda anticipó el criterio de que el art. 3 de la Ley no constituye una *carte blanche* a los colonos para cambiar de sitio de molienda a su gusto y con la única formalidad de un aviso a tiempo y que, por el contrario, en determinadas circunstancias las obligaciones contraidas en contratos de refacción y molienda y de otra índole podrían constituir limitaciones al ejercicio de esa autonomía. Considerada la gran diversidad de situaciones que podrían surgir, la Junta sabiamente prefirió ir fijando esas limitaciones mediante el lento pero más realista procedimiento de la resolución de casos particulares. De sus más importantes decisiones en este campo entresacamos las siguientes normas básicas: 1. la libertad que concede el art. 3 a los colonos puede renunciarse cuando media causa y la Junta examinará detenidamente el contrato "especialmente en lo que se refiere a la substancialidad de la consideración o causa y al hecho de que ésta represente el verdadero *quid pro quo* del contrato" (Caso *Rodolfo Morales Pérez*, 0–6, p. 11, 1953) ; 2. la obligación de la central de molerle

las cañas al colono no es causa suficiente para denegar un traslado de molienda (Caso *Julio Rosado Cruz*, 0-4, 1953) ni aun cuando el contrato de molienda hubiese formado parte del contrato de compraventa de la finca (Caso de *Autoridad de Tierras*, 0-7, 1953) ; 3. tampoco es causa suficiente que la central le facilite refacción al colono sin obligación contractual y fijando ella las cantidades que le prestaría (Caso *Ramiro Vázquez Colón*, 0-8, 1954) ; 4. también desaparece la causa cuando existe un contrato de refacción y molienda por varios años pero antes de su vencimiento el colono refaccionado paga lo que debe y la central acepta el pago aunque insistiendo en que se cumpla el contrato de molienda (Caso *José Antonio Laborde*, 0-24, 1955) ; 5. si el colono está en deuda con la central por razón de préstamos refaccionarios, subsiste la causa que le ata a la central y no se aprueba el cambio de molienda hasta tanto se pague la deuda en su totalidad (Caso *Luis G. Cestero*, 1957) ; y 6. se aplica la misma norma anterior cuando el colono ofrece pagar la deuda refaccionaria en dinero pero la central, amparándose en el contrato, no acepta e insiste en que se pague en cañas. (Caso *Miguel A. Márquez*, 279, 1957.) [3]

¿Qué razones han movido a la Junta a adoptar y mantener uniformemente las dos últimas normas? La claridad con que han sido expresadas por ella hace innecesaria la paráfrasis.

". . . . no podemos interpretar el artículo 3 en una forma tan amplia que le dé libertad al colono de escoger la central para la molienda de sus cañas rescindiendo contratos válidos de refacción y molienda de cañas afectando así adversamente la industria en general, y por consecuencia estando en contra del interés público. Las centrales azucareras no refaccionan al colono para hacer negociaciones y evoluciones con el dinero

[3] La Junta ha aplicado estas normas en numerosos casos. Examínense los siguientes ejemplos recientes: *Isidro Rivera González*, Querella Núm. 15 (1961) ; *Cooperativa Azucarera Los Caños*, Cambio de Molienda Núm. 165 (1961) ; *Jesús Ortiz Hernández*, Cambio de Molienda Núm. 294 (1961) ; *Antonio Meléndez*, Cambio de Molienda Núm. 136 (1960) ; *Juan González González*, Caso Núm. 262 (1960).

que le prestan, pero sí para conseguir un abasto de cañas que les permita operar dentro de su mayor eficiencia técnica.

"Como dijimos en el caso de Pascual Bidot Machado sería ir demasiado lejos al interpretar esta condición de molienda libre impuesta al colono como que anula o invalida todo contrato de refacción de molienda de cañas con vigencia mayor de un año. Esta Junta por la larga experiencia de sus miembros en la industria azucarera, requisito esencial para ocupar el cargo que desempeñan, según el artículo 10, párrafo tercero de la Ley 426 de 13 de mayo de 1951, tiene necesariamente que tomar conocimiento oficial de los hechos siguientes:

"1. Generalmente los colonos que se refaccionan con las centrales son personas que no califican para tomar dinero a préstamo en las fuentes ordinarias de crédito, ya que la única garantía que pueden ofrecer es el producto de las cañas a ser producidas con el dinero tomado a préstamo.

"2. En todo programa de siembra de caña el primer año es costosísimo ya que no se dispone de retoños para reducir el costo de la producción por cuerda de caña. Como resultado de esto, el ingreso neto obtenido por un colono en sus cañas de gran cultura o primavera (primer costo de la caña), es inferior al costo de producción de esas cañas. Los beneficios generalmente resultan de los cosechos subsiguientes.

"Por lo tanto, cuando una central refacciona a un colono, sabe que por regla general, sus posibilidades de cobro, del primer año son muy escasas y que las mismas aumentarán cuando el colono cultive y corte los retoños subsiguientes.

"Esta es la razón principal por la cual todo contrato de refacción y molienda de cañas envuelve por lo general, más de un año de vigencia. Si la vigencia de todo contrato de refacción y molienda se limitará a un solo año, las centrales se negarían a refaccionar a todos los colonos que carecieren de garantía colateral suficiente para responder por el monto total de su deuda. Esto afectaría en sus cimientos todo el sistema de crédito agrícola existente en Puerto Rico, con grave perjuicio, no sólo para los colonos de caña sino para el interés público en general.

"Convenimos en que es cierto que los contratos de refacción y molienda de caña podrían prolongarse un número de años tal que anularía la intención legislativa de restablecer la libertad del colono para moler sus cañas en la central de su elección.

Pero hasta la fecha ese caso no ha llegado hasta nosotros."
Caso de *Miguel A. Márquez,* págs. 14–16.

Esas son, no hay duda, razones muy poderosas, producto de la reflexión y la experiencia.

Un estudio a fondo[4] de las facilidades crediticias en la agricultura del país, confirma las conclusiones de la Junta. Comprueba que: los agricultores de caña de azúcar tienen numerosas fuentes de crédito, públicas y privadas; anualmente obtienen alrededor de $60 millones de crédito, de los cuales las centrales aportan unos $12.6 millones;[5] las centrales generalmente extienden crédito a corto plazo para que los colonos puedan hacer la cosecha, y los contratos abarcan la producción, la zafra y la entrega de la caña a las centrales; los colonos se obligan a pagar con la cosecha; en el caso de las centrales azucareras también están obligados por contratos de molienda que a veces se prolongan por varios años; "Los productores medianos y pequeños se han beneficiado de la competencia entre las centrales por obtener el mayor volumen de caña para moler. Esto ha traído un aumento de sus actividades prestadoras en los últimos años";[6] y los que no toman prestado a las centrales azucareras encuentran dificultades en la obtención de crédito cuando no tienen colaterales adecuadas y aceptables. Se afirma finalmente que "de los 15,500 colonos que molieron cañas en 27 centrales en el año 1956, 10,700 o el 60 por ciento usaron a la central como su fuente de crédito. El peso de sus cañas fue sin embargo aproximadamente 3,800,000 toneladas o como 50 por ciento de las 7,700,000 toneladas molidas por todos los colonos. Esto significa que los colonos que tomaron refacción de las centrales estaban por debajo del promedio en tamaño".[7] Los descritos

[4] Perkins, *El Crédito y Problemas Afines en la Agricultura de Puerto Rico* (1956).

[5] No se incluye lo aportado por las centrales de la Autoridad de Tierras y las cooperativas.

[6] Vol. I, pág. 70.

hallazgos comprueban la enorme importancia que tienen las facilidades crediticias que ofrecen las centrales a los agricultores de caña, y particularmente a los medianos y pequeños. Es evidente que la Junta actúa con gran sabiduría cuando adopta una interpretación del art. 3 de la Ley Azucarera que protege debidamente esas indispensables fuentes de crédito.

Debe añadirse a lo anterior la imposibilidad de creer que mediante una disposición de tan cortado alcance como lo es el art. 3 de la Ley Azucarera, se intentara dejar sin efecto las obligaciones contractuales nacidas al amparo de una ley de tan vital importancia para la industria azucarera, y en consecuencia para la economía del país, como la Ley de Refacción Agrícola y Molienda de Cañas de 1910 (5 L.P.R.A. secs. 164–180). Para aprobar ese resultado necesitaríamos, sin duda, una declaración legislativa más específica.[8]

¿Por qué, sin embargo, la Junta prohibe el cambio de molienda cuando el colono está en deuda con la central pero lo autoriza, como en el caso que examinamos, cuando no existe esa deuda? En ambas situaciones el contrato no ha vencido y, por tanto, siguen vigentes las obligaciones bajo él contraidas y las conocidas protecciones especiales que le otorga la Ley de Refacción Agrícola.

Como señalamos anteriormente, la Junta basó su criterio en lo expresado por ella en el citado caso de *Central San Vicente* (conocido también como caso *Laborde*), según fue confirmado por este Tribunal. Debemos, por tanto, analizar esas expresiones.

---

[7] Vol. II, pág. 81. Conviene además conocer que según el citado informe "La caña de azúcar se produce en 19,500 fincas, 15,000 de las cuales son menores de 10 acres y recolectan como un 10 por ciento de la cosecha. Las restantes 4,500 fincas producen el 90 por ciento de la caña que se cultiva". Vol. I, pág. 67.

[8] Con posterioridad a 1951, año en que se aprobó la Ley Azucarera, se han hecho varias enmiendas a la Ley de Refacción Agrícola sin que se haya expresado propósito alguno de limitar sus efectos. Véase 5 L.P.R.A. Suplemento Acumulativo 1960, secs. 164, 169 y 176.

La resolución de la Junta en dicho caso examina las diversas disposiciones de la antedicha Ley de Refacción y concluye que ella no contiene "disposición alguna que provea para la resolución o terminación del contrato por el pago del crédito refaccionario." No obstante y fundándose en una interpretación muy particular de los artículos 1044, 1208 y 1210 del Código Civil, la Junta añade que aun cuando el contrato de tracto sucesivo es válido y contiene prestaciones mutuas, la obligación de molienda del colono cesa al aceptar la central el pago de lo adeudado hasta la fecha. Añade que la obligación de la central de refaccionar al colono termina con la notificación de transferencia de molienda del colono. Luego de hacer referencia a su política de proteger los créditos preferentes de las centrales por concepto de refacción agrícola debido a la importancia de la industria azucarera, y de señalar que las centrales azucareras no se dedican al negocio bancario, y si entran en negocios de esa clase es para asegurarse el abasto de suficientes cañas, la Junta dice: "Pero a pesar de todos estos argumentos tenemos que interpretar la ley azucarera vigente según está escrita basándonos en razones de utilidad social y orden público y el artículo 3 de dicha ley provee específica y claramente *sin límites de índole alguna* la libertad del colono de escoger la central donde desee moler sus cañas". (Énfasis suplido.) Y más adelante: "La claridad de los preceptos citados no permite otra interpretación porque ello iría contra los principios fundamentales de la Ley Azucarera vigente cuyo propósito entre otros, fue el garantizarle al colono la libertad de escoger la central que más le convenga para la molienda de sus cañas, y al concederle al colono esa libertad permitirle el tratar de obtener una distribución proporcional mayor que la participación mínima fijádale por ley en el producto de sus cañas".

En nuestra opinión en el citado caso de *Central San Vicente,* consideramos innecesario resolver la cuestión arriba planteada debido a que las partes habían incorporado expre-

samente al contrato las disposiciones de la Ley Azucarera, y, por tanto, las del art. 3, y la central de esa manera había reconocido el derecho del colono a cambiar el sitio de molienda previo el cumplimiento del requisito de aviso. Debemos ahora fallar sobre dicha cuestión.

Es de notar, en primer término, la dualidad de enfoques utilizada por la Junta al juzgar las dos situaciones que hemos estado examinando. En el caso en que el colono adeuda a la central todo o parte del préstamo refaccionario, la Junta afirma que no puede ser absoluta la libertad de cambiar de sitio de molienda y señala los efectos adversos que tendría sobre la industria azucarera una norma que limitara los contratos de refacción y molienda a un solo año. Sin embargo, cuando la situación es exactamente igual excepto que en un año determinado durante la vigencia del contrato el colono ha satisfecho la deuda pendiente, la Junta da entonces énfasis a la libertad de molienda del art. 3—"sin límites de índole alguna"—descarta los factores económicos que la impulsaron a proteger la contratación por más de un año, y se apoya en una interpretación de la ley general de contratos para permitir el cambio de molienda.

No obstante, a poco que se reflexione sobre el asunto se observará que los factores económicos que son decisivos en el primer caso mantienen su plena eficacia en el segundo. A éste, sin duda le son igualmente aplicables las consideraciones de que: 1. las centrales no refaccionan a los colonos para hacer evoluciones con el dinero que le prestan y sí para conseguir un abasto de cañas que les permita operar dentro de su mayor eficiencia técnica; 2. los colonos que se refaccionan con las centrales son personas que no califican para tomar dinero a préstamo en las fuentes ordinarias de crédito, porque carecen de garantía colateral y sólo pueden ofrecer sus cañas en garantía; y 3. al momento de firmarse el contrato, la central sabe que de ordinario se arriesga a no cobrar la deuda durante el primer año. No creemos, por consiguiente,

que en cuanto a estos factores decisivos y en cuanto a los efectos generales sobre las facilidades de crédito en la industria, exista diferencia alguna entre las dos situaciones.[9] La Junta ciertamente rebaja estas consideraciones básicas al nivel de una mera medida adicional para obligar al pago de deudas refaccionarias, cuando limita su aplicación sólo a los casos de incumplimiento del pago por el colono.

Tampoco es correcta la interpretación de la ley de contratos que hace la Junta. Claramente no puede decirse que la causa única del contrato de refacción y molienda para la central sea el pago que promete el colono en dinero o en especie. Más importante para ella, según acepta la propia Junta, es la obligación del colono de suministrarle por varios años parte del "abasto de cañas que le permita operar dentro de su mayor eficiencia técnica." Esa obligación no se extingue por el hecho de que en un momento determinado del contrato, el colono se encuentre en posición de no adeudar nada a la central.[10]

---

[9] La contradicción es aun más clara en el caso en que el colono ofrece pagar en dinero y la central, amparándose en el contrato, exige que sea en cañas. La Junta prohibe el cambio de molienda en ese caso y se ampara otra vez en los factores económicos enumerados en el texto.

[10] Así lo había resuelto originalmente la misma Junta. En el caso de *Félix M. Dávila Vega*, 0–5 (1953) la central y el colono formalizaron un contrato de refacción y molienda para las zafras de 1952, 1953 y 1954. En 1952 el colono vendió la finca descrita en el contrato a otra persona, cuando había ya liquidado su deuda con la central. La Junta resolvió que el contrato era válido y que obligaba al nuevo adquirente por haber sido debidamente inscrito. Sobre la cuestión legal, la Junta por unanimidad resolvió lo siguiente:

"Las obligaciones contractuales de las partes y sus sucesores en título, según aparecen del contrato, consisten por parte de la Central en estar dispuesta a dar refacción durante los años de duración del contrato y por parte del colono a moler en la Central durante el mismo tiempo. La Central estuvo dispuesta durante la zafra de 1953 y también para la zafra de 1954 a dar la refacción especificada en el contrato y así se lo hizo saber al colono. La Central, por lo tanto, cumplió su obligación y el hecho de que el colono no utilizara esta refacción no lo libera de sus obligaciones con la central, pues la Ley de Contratos de Refacción y Molienda exige a los adquirentes el cumplimiento de todas las obligaciones del contrato. Es decir, la Ley no limita la obligación al pago de la deuda refaccionaria, sino que ha de cumplirse la totalidad de lo pactado lícitamente (Sección 5 Ley Sobre Contratos de Refacción

Esto es así máxime en un caso como el presente, en el cual las partes expresamente pactaron que el colono no habría de quedar relevado de su obligación "por el hecho de haber pagado o no adeudar préstamos refaccionarios a la Central".

Tanto en el caso de *Laborde* como en el presente, la Junta funda su criterio en la aplicación de la máxima *rebus sic stantibus*, aduciendo que "las circunstancias básicas que dieron nacimiento al contrato original han variado debido a la aceptación del pago de la deuda refaccionaria" por la central. Este fundamento es obviamente erróneo, aun en la hipótesis de que la citada doctrina tuviese vigencia en nuestro derecho. Cf. *Rodríguez* v. *Municipio*, 75 D.P.R. 479, 491–492 (1953). Como se explica en un hábil comentario sobre el asunto, "La cláusula 'rebus sic stantibus' es de aplicación exclusivamente a aquellos casos en los cuales, debido a sucesos graves, imprevistos e imprevisibles, el cumplimiento por una parte de su obligación contractual, aunque posible, resulta exageradamente oneroso o ruinoso". Álvaro Calderón, Jr., *La Cláusula Rebus Sic Stantibus y el Riesgo Imprevisible en el Derecho Puertorriqueño*, 19 Revista Colegio Abogados de Puerto Rico 5, 7, 15 (1958). En el caso que consideramos no se trata de "sucesos graves" y mucho menos "imprevistos e imprevisibles", y el cumplimiento de la obligación de moler en la central contratante, en modo alguno "resulta exageradamente oneroso o ruinoso" para el colono.

■ La interventora por su parte señala que en caso de existir la obligación del colono de continuar moliendo sus cañas en el molino de la corporación contratante, no debe, sin embargo, extenderse esa obligación a la arrendataria. El legislador anticipó esa situación al proveer lo siguiente en la sec. 8 de la citada Ley de Refacción:

---

Agrícola y Molienda de Cañas). Si el colono no ha querido hacer uso de la refacción es asunto que a él le incumbe únicamente, pero no lo libera de la obligación de moler las cañas producidas en la finca objeto del contrato en la Central contratante, pues esta obligación no está condicionada al uso de la refacción ofrecida y garantizada."

Más tarde, como hemos visto, la Junta cambió de criterio.

"Si después del registro de un contrato de refacción y molienda de cañas, las cañas objeto del mismo o cualquier interés en ellas, o las factorías o centrales en que dichas cañas hayan de molerse, fueren traspasadas por acto voluntario o por ministerio de la ley, el adquirente estará obligado a cumplir todas las obligaciones del contrato y será responsable de la falta del cumplimiento del mismo, en igual modo y con la misma extensión que las partes contratantes; bien entendido que ningún traspaso relevará a los contratantes de sus obligaciones o responsabilidades en el contrato."

Esa obligación subsiste aun cuando el verbo "arrendar" no figurara junto a los de "vender, donar, permutar [e] hipotecar" en la cláusula del contrato que obliga al colono a no realizar esas actuaciones sino con la condición de que la tercera persona "se obligue a respetar en todas sus partes" el contrato. La obligación de la arrendataria nace como ya hemos visto del compromiso, protegido por la Ley de Refacción Agrícola, que contrajo el arrendador.

 Tampoco es nulo el contrato porque incluyera una cláusula que obliga al colono a mantener "buenas condiciones de cultivo" y a entregar cañas "buenas y sanas" a la central. No es de aplicación lo resuelto en *Mayagüez Sugar Co.* v. *Junta Azucarera*, 78 D.P.R. 887, 891, 892.

En resumen, el análisis que hemos hecho del problema nos lleva a las siguientes conclusiones:

1. Ni de la letra del art. 3 de la Ley Azucarera ni de su historial legislativo se desprende que la libertad reconocida a los colonos de cambiar el sitio de molienda de sus cañas no pueda ser objeto de contratación razonable por ellos.

2. Desde la aprobación de la Ley hasta el presente, el organismo encargado de su administración ha reconocido, en atención a las poderosas razones económicas y legales ya expresadas, que esa libertad no puede ser absoluta y que en determinadas circunstancias el colono puede, en el ejercicio de su libre voluntad, fijarse limitaciones.

3. Cuando el contrato entre la central y el colono es exclusivamente de molienda y la central meramente se obliga en dicho contrato a cumplir con los deberes y a pagar las compensaciones

que la ley fija, debe entenderse que el colono no ha limitado su derecho a cambiar anualmente la molienda de sus cañas, ya que no existe, por lo menos en términos económicos reales, causa alguna para su obligación[11] y se limitaría la libertad del colono sin él recibir ningún beneficio. Además, es obvio que los vitales factores económicos, ya descritos en esta opinión, sólo pueden tener vigencia si la central le extiende crédito al colono.

4. Cuando el contrato es uno de refacción y molienda o uno por el cual el colono recibe compensaciones adicionales a las fijadas por la Ley Azucarera, y no es contrario a las disposiciones o la política pública de dicha Ley, el colono tiene la obligación de cumplir el compromiso libremente contraido por él de moler sus cañas en el molino de la central contratante, durante los años especificados e independientemente de que en algunos de esos años hubiese pagado totalmente en cañas o en dinero los préstamos hécholes por la central hasta la fecha.

■ ■ Es norma reiterada de este Tribunal la de merecerle "gran consideración y respeto" las conclusiones e interpretaciones de los organismos administrativos especializados. *Colonos de Caña de Santa Juana, Inc.* v. *Junta Azucarera,* 77 D.P.R. 392, 396 (1954) y sentencias allí citadas. Cobra más énfasis esa actitud cuando revisamos los fallos de ciertos organismos que tienen a su cargo la reglamentación de complejos procesos técnicos, sociales o económicos. Pero la citada norma no es por sí sola suficiente para enmarcar las relaciones que deben existir entre administradores y jueces en la difícil y a ratos angustiosa tarea de la revisión judicial.[12] Comprendemos que los primeros tienen la responsabilidad inicial y primaria de elaborar las normas, que a tales fines son delegados de la Asamblea Legislativa con autoridad para reglamentar importantes actividades económicas bajo amplios mandatos legislativos, que de ordinario se les

---

[11] En Álvaro Calderón, Jr., *Obligaciones y Contratos—Existencia o Inexistencia de Causa en Obligaciones Impuestas por Ley,* 16 Revista Colegio de Abogados de Puerto Rico 111 (1956) se expresa el criterio de que no existe causa como cuestión técnica bajo el derecho de obligaciones. Es innecesario resolver ese problema.

[12] Examínese sobre este asunto, la excelente discusión que se encuentra en 4 Davis, *Administrative Law Treatise* (1958) págs. 189–270.

selecciona para esa tarea por su reconocida capacidad y experiencia, que en su diaria entrega a esas actividades desarrollan una sensibilidad especial que hace más confiables sus diagnósticos y sus remedios, y que el elemental principio de la división de trabajo más el respeto a la confianza legislativa depositada en esos administradores, deben moderar las ansias judiciales de dictar las "mejores" soluciones. Pero los jueces reciben también un mandato legislativo de revisar las actuaciones administrativas, el cual deben cumplir cabalmente. Tienen, además, en mucho mayor grado que los administradores, la oportunidad de situar estas controversias en un ámbito más amplio, donde la consideración decisiva tiene que ser el continuado mantenimiento de un vigoroso régimen de derecho en la comunidad, abonado por la indispensable fe pública en los procesos administrativos y judiciales.

No surgen problemas de importancia en esta área cuando la actuación administrativa es obviamente ilegal, arbitraria, caprichosa o irrazonable, o cuando se realiza fuera de claros requisitos procesales de constitución o de ley. Es cuando constituye, como en este caso, una expresión de un criterio razonado, y se siguen los debidos cauces de procedimiento, que surgen las perplejidades. La solución, desde luego, no puede reducirse a un axioma infalible, bueno para todas las ocasiones. Las circunstancias de ley, actividad, hechos y época necesariamente afectarán decisivamente la respuesta final. Pero como norma básica los tribunales tienen la obligación de exigir que la conclusión administrativa se apoye explícitamente en la razón y la ley y sea parte de un patrón integrado y razonable de reglamentación. No se cumple con esa norma cuando se dictan soluciones contradictorias para situaciones fundamentales idénticas.

*Se revocará la resolución recurrida y se devolverá el caso a la Junta Azucarera para procedimientos ulteriores compatibles con esta opinión.*

Los Jueces Presidente Sr. Negrón Fernández y Asociado Sr. Belaval no intervinieron.