# 2001 DTA 116

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL V DE PONCE Y AIBONITO
PANEL SUSTITUTO**

FARMACIA DEL CARMEN; FARMACIA GONZALEZ Y FARMACIA SAN ANTONIO
Recurrentes

v.

DEPARTAMENTO DE SALUD; FARMACIA LA VEGA, INC. Y/O SANDRA RODRIGUEZ
Recurridos

Núm. KLRA-00-00348

San Juan, Puerto Rico, a 7 de febrero de 2001

Panel integrado por su Presidente, el Juez Brau Ramírez,
y los Jueces González Rivera y Ortiz Carrión

González Rivera, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

Las Farmacias del Carmen, González y San Antonio solicitan, mediante el presente recurso, que este Tribunal revise y revoque la resolución del Departamento de Salud (en adelante, el Departamento) emitida el 16 de marzo de 2000. Mediante la misma, el Departamento le concedió a la Farmacia La Vega un Certificado de Necesidad y Conveniencia (CNC) para establecerse en la Carretera 151 Km. 0.2 del Municipio de Villalba. Esto en virtud del Reglamento Núm. 89 del Departamento.

En su recurso, las recurrentes-opositoras señalan que el Departamento erró al conceder el CNC por las siguientes razones: 1) al no haberse tomado conocimiento judicial de la denegación a diferentes facilidades de salud en el área; 2) al no haberse obtenido los permisos de la Administración de Reglamentos y Permisos (ARPE); 3) al descartarse el informe pericial de las opositoras; y (4) al no estar avalado el dictamen recurrido por evidencia sustancial que obre en el expediente administrativo.

El 25 de mayo de 2000, la parte recurrida presentó su oposición al recurso en la cual solicita la desestimación del mismo por alegadamente no haberse cumplido con el Reglamento de este Tribunal. El 5 de junio de 2000, la recurrente presentó una réplica al escrito de oposición de las recurridas.

Finalmente, con el beneficio del escrito en oposición de la Farmacia La Vega, Inc. y el beneficio de la transcripción estipulada de la prueba oral que tuvo ante su consideración la agencia recurrida, nos encontramos en posición de analizar las alegaciones formuladas en el recurso.

## I

De la transcripción presentada por las partes, se desprende que la Farmacia La Vega, Inc. y/o Sandra Rodríguez solicitaron al Departamento, el 3 de agosto de 1998, la expedición de un CNC para establecer una nueva farmacia en el Municipio de Villalba. Luego de los correspondientes procedimientos administrativos incidentales a este tipo de caso, incluyendo la presentación de un recurso de revisión ante este Foro Apelativo ■ y devueltos los autos a la agencia administrativa para la celebración de una nueva vista en su fondo, finalmente la misma se celebró el 21 de enero de 2000. A la vista compareció la proponente, Farmacia La Vega, con su representación profesional, así como las opositoras, aquí recurrentes, con su respectivo representante legal. La Farmacia La Vega presentó como testigos a la Sra. Sandra Rodríguez, Presidenta de la Corporación Farmacia La Vega, Inc., y al Sr. Gualberto Negrón Martínez, dueño del inmueble donde se pretende establecer la nueva farmacia. También presentó a la perito economista, Lcda. Heidi Calero. Por su parte, las opositoras presentaron los testimonios de la Sra. Elides Bonilla Colón, Carmen I. Rivera Cintrón, Hilda I. González y al perito economista Dr. Mohinder Bhatia.

El testimonio del Sr. Negrón Martínez giró en torno a su intención de arrendar su propiedad a Farmacia La Vega. Por su parte, la Sra. Rodríguez Sosa declaró que solicitó un C.NC para establecer la farmacia en controversia. La misma estaría ubicada en un área que comprende 2,000 pies cuadrados de los cuales 300 ocuparán el recetario. El local provee seis espacios de estacionamiento adicionales a los que existen en sus alrededores. La Sra. Rodríguez Sosa contempla adquirir equipo modernizado de computadoras, mobiliario, góndolas, cajas registradoras, neveras para guardar medicamentos y plantas generadoras de electricidad. Como parte de los servicios que se propone brindar, está dar charlas a la ciudadanía sobre hipertensión, diabetes y servicios de vacunación en coordinación con el Departamento de Salud.

La Sra. Rodríguez Sosa pretende contratar, como parte del personal para operar la farmacia, a dos farmacéuticos, dos auxiliares, un contador a tiempo parcial, un administrador, dos cajeros, dos empleados de piso

y otro personal.

El horario de la farmacia propuesta será de lunes a sábado de 7:00 a.m. a 10:00 p.m. y los domingos de 11:00 a.m. a 5:00 p.m. A largo plazo, la farmacia tiene como objetivo extender su horario para dar servicio las 24 horas del día. Pretende así abrir sus nuevas facilidades en un lapso de entre seis meses a un año. Actualmente, cuenta con un capital para operar de $100,000.00. Aunque ha solicitado los permisos requeridos a A.R.P.E., éstos no le han sido extendido aún. Una vez en operación, aceptará todos los planes de salud, incluyendo el plan de la Reforma de Salud.

La perito economista, licenciada Calero, cuya capacidad como tal fue estipulada, declaró en torno a la viabilidad de la farmacia propuesta. De su testimonio se desprende que en el área de la milla propuesta existen actualmente tres farmacias. Al momento de efectuar su estudio, no tenía disponible información sobre el número de recetas despachadas por las farmacias, por lo que procedió a determinar la viabilidad financiera de este proyecto basándose en información relevante obtenida de la Asociación de Dueños de Farmacias. Los estudios utilizados indican que una farmacia como la propuesta, puede vender anualmente entre $250,000 a $300,000. Con ese dato, pudo corroborar, junto a la información que recibió sobre recetas despachadas y a base de la experiencia de otras farmacias, y determinó que los ingresos contenidos en su informe son razonables.

Al analizar la propuesta de Farmacia La Vega, a la luz de los criterios de viabilidad en el área, concluyó que la propuesta cumple con los criterios específicos requeridos por el Departamento de Salud. No obstante, aclaró que al momento de hacer su informe no tuvo ante sí información relacionada al impacto adverso que la nueva operación le produciría a las demás farmacias. Al no tener dicha información disponible, utilizó el criterio de demanda y oferta del servicio. De tal forma, estimó que el gasto de medicinas en Puerto Rico es de unos $550 por persona, lo cual arroja para el Municipio de Villalba, a base de su población, un estinado en gastos de medicina de $1,600.00 dólares anuales, a base de un precio promedio de medicamento por receta de aproximadamente $14.00. Esto, según explicó, equivale a la mitad de lo estimado en otras áreas urbanas, como Caguas, o la mitad de lo que vende una farmacia como Walgreens.

La licenciada Calero consideró como parte de su estudio, la demanda de servicios en el municipio, la cual consideró como un área en crecimiento. Determinó que existe una demanda no atendida, ello basado en que las farmacias comprendidas en la milla no están ofreciendo servicios después de las 8:00 p.m., ni los sábados y domingos. Por lo tanto, la Farmacia La Vega puede entrar a cubrir esa demanda.

Consideró, además, factores socioeconómicos, de población, composición industrial, comercio al detal y los aspectos de salud. Aclaró que al momento de su estudio, por no tener información sobre las ventas y recetas despachadas en el área, utilizó como indicador el último informe preparado por la Farmacia González al Departamento de Salud en el año 1995, en el cual informó un despacho de 10,000 recetas al año. Utilizando esa cifra realizó una proyección actualizada para el área de 90,000 recetas para el año. Su cómputo reflejó un crecimiento de casi un 24% con respecto a años anteriores. Concluyó que, definitivamente, esa área ha tenido un crecimiento en término de números de recetas despachadas. Expresó que ese crecimiento o aumento de demanda es habitual, pues todas las farmacias en la isla de Puerto Rico han experimentado un aumento extraordinario en el despacho de sus recetas, ello a partir de la implantación de la Reforma de Salud. Esas personas acogidas a la reforma representan un mayor mercado para las farmacias de la comunidad.

Explicó que utilizando el índice "Herfindahl-Hirschman" y asumiendo que la Farmacia González hubiere estado despachando 10,000 recetas, el índice de concentración sería de 4,344 para las tres farmacias del área distribuido de la siguiente forma: Farmacia San Antonio con 50,827 recetas, Farmacia Del Carmen con 30,000 y la Farmacia González con 10,000. El índice es de 4,343.7. Al entrar la Farmacia La Vega al mercado, el índice de concentración sería de 3,249.6. Concluyó que para cualquier mercado, eso sigue siendo un nivel concentrado, por lo que la entrada de la Farmacia La Vega al mercado del Municipio de Villalba contribuye a aumentar la competencia y a reducir la concentración.

Respecto a la cantidad de recetas informada por la Farmacia González en su contestación al interrogatorio, del cual surge que el número de recetas despachadas para el 1999 fue de 35,000, la perito contestó que esa información tiene el efecto de aumentar el promedio de recetas despachadas en 115,000 por año, para un aumento de un 26%.

Concluyó la licenciada Calero que durante el primer año la farmacia propuesta generará ingresos aproximados en ventas de $270,000 con un costo de venta de $162,000 en el primer año. Ello produciría un beneficio bruto de $108,000 y un total de gastos operacionales de aproximadamente $103,000, para un ingreso neto durante el primer año de $4,746 que continuará creciendo hasta el quinto año en $8,328. La farmacia tendrá un flujo positivo que en el primer año alcanzará la cifra de aproximadamente $150,000 y en el quinto año de $171,000. Por las razones expuestas, concluyó que la farmacia propuesta es viable.

Como primer testigo de las farmacias opositoras, declaró la Sra. Elides Bonilla, dueña de la Farmacia San Antonio. Declaró que su farmacia ha experimentado una disminución en el despacho de aproximadamente 14,000 recetas en el año. Ello debido a la privatización del Centro de Diagnóstico y Tratamiento de Villalba, el cual está ahora en manos de un grupo privado de médicos que opera su propia farmacia. Por lo tanto, la mayor parte de las recetas que se originan en ese centro, se quedan en él.

En cuanto a la prestación de servicios de farmacia los domingos, expresó que la Farmacia Villalba abre sus puertas ese día, pero que siendo el pueblo pequeño, no tiene mucho movimiento de personas y no hay necesidad de que las demás farmacias abran para brindar servicios ese día.

Por su parte, la Lcda. Carmen I. Rivera Cintrón, dueña de la Farmacia Del Carmen, declaró que su farmacia ha experimentado una disminución en el despacho de recetas de aproximadamente 8,800 recetas en un año. Esto debido a que el mercado ha registrado una disminución drástica en dicho despacho. Expresó que atribuye esa disminución a que en Villalba se implantó la Reforma de Salud, a la cual se ha acogido un 90% de la población. El grupo mayor de ciudadanos acogidos a la reforma pertenecen al grupo médico San Cristóbal. Las recetas de ese centro se quedan en su propia farmacia, por lo que ese mercado no está disponible para las farmacias del pueblo.

Justificó, además, la disminución en el despacho de recetas a que la clientela que mayormente atiende son envejecientes del área rural y la transportación pública no se brinda, sino hasta la 1:00 o las 3:00 de la tarde. Esas personas mayores se van a sus casas temprano, motivo por el cual el movimiento del público disminuye a esas horas.

La próxima testigo de las opositoras fue la Sra. Hilda Ivette González Santiago, quien administra la Farmacia González, propiedad de su padre. Expresó que para el año 1988 despachó 47,313 recetas y para el año 1999 tuvo una merma de 13,000 recetas, para un total despachado de 34,313. Atribuyó la disminución en el despacho a la privatización del Centro de Diagnóstico y Tratamiento del pueblo que absorbe las recetas que se generan en sus propias facilidades farmacéuticas. Entiende que de aprobarse o concederse el Certificado de Necesidad y Conveniencia a la Farmacia La Vega, su farmacia se verá muy afectada.

Como perito economista de las opositoras, declaró el doctor Mohinder Bhatia. Expresó que la conclusión principal a la que llegó la economista Calero, es errónea, puesto que no hay necesidad de establecer otra farmacia en el Municipio de Villalba. En segundo término expresó que no existe demanda de nuevos servicios en el área, por lo que el proyecto no es viable.

Al discrepar del informe de la licenciada Calero, expresó que ésta no presentó el número de densidad de población, que para Villalba es de 666 personas. Expresó, además, que la población del municipio de acuerdo a los censos de población de 1990, es de 25,559 personas, de esos sólo 4,159 son personas que viven en el área urbana, por lo que en esa área no existe demanda de servicios para una nueva farmacia.

El doctor Bhatia criticó la conclusión de la licenciada Calero en el sentido de que la carretera en que ubicará la farmacia propuesta constituye una ruta de acceso al Municipio de Villalba para los vecinos de los municipios de Orocovis, Coamo y Juana Díaz. Concluyó que la licenciada Calero presupone que esas personas, aunque residen en otros municipios, harán sus compras en Villalba. Al estar errados los estimados de población, también están errados los estimados de distribución de población por edades presentes y futuras. Expresó, además, que siendo la población de Villalba menor que el resto de la isla, hay menos demanda de esos ciudadanos para servicios de salud, incluyendo ventas y compras de medicinas.

Al determinar el ingreso "*per capita*" en el Municipio de Villalba, el doctor Bhatia expresó que el ingreso en Villalba para el 1980 fue de $1,037. En 1990 aumentó a $1,761, lo que significa, en su opinión, que en el municipio cada vez hay más pobreza. Respecto al ingreso mediano familiar en el municipio, explicó que fue de $1,993 en el 1980, cifra que aumentó en el 1990 a $2,341, lo que significa, en su opinión, que Villalba está retrocediendo en comparación con el resto de Puerto Rico, lo que se traduce en menos demanda de servicios, incluyendo medicinas.

Por otro lado, expresó que el nivel de pobreza en Puerto Rico es de 58.9% y en Villalba es de 76.2%, ello se traduce en costos más altos en el municipio, por lo que habrá menos demanda de medicamentos.

Al hacer referencia a un estudio sobre demanda de viviendas realizado por la firma Estudios Técnicos, surge del mismo que en Villalba hay necesidad de 1,171 casas para el 1990. Manifestó que al no estarse construyendo esas unidades de vivienda, no habrá demanda, ni capacidad económica para pagar esas casas.

En cuanto al empleo en el municipio, las cifras en el 1995 y en el 1998, no reflejan cambios. En ambos años, la cifra permaneció igual. En el 1999, la cifra del mes de febrero reflejó una baja de 4,800 empleos, lo que significa menos poder de compra y, por ende, menos demanda de los servicios de farmacia.

Manifestó estar en desacuerdo con la licenciada Calero en sus conclusiones sobre empleo, capital de inversión en la farmacia propuesta y en su recetario, el número de pies cuadrados a ser utilizados con ese propósito y en el estimado total de ventas anuales a generarse. Discrepó, además, sobre el número de personas que habrían de hacer visitas al médico, el estimado total de nóminas, los impuestos a pagarse y las ganancias a generarse.

En cuanto al índice "*Herfindahl*", opinó que es casi ridículo aplicarlo a una comunidad pequeña. Señaló que tal índice puede aplicarse a grandes empresas como IBM, General Motors, Ford Motor Company, Citibank, Banco Popular y otros, pero no al Municipio de Villalba.

Concluyó expresando que la farmacia propuesta va a generar pérdidas en su primer año de operación de aproximadamente $25,000, que no va a generar competencia, y que en consideración al número de farmacias existentes y los números de población urbana y rural existente en el municipio, el proyecto no es viable.

El 15 de marzo de 2000, el Oficial Examinador emitió su informe, en el cual recomendó favorablemente el CNC solicitado. Basó su conclusión en las siguientes determinaciones:

"*4. De la lectura integral de la totalidad del expediente y de la prueba testifical surge que:*

*(a) La parte proponente demostró que el mercado de servicio estará mejor servido con la inclusión de la farmacia propuesta, ya que se estimulará una sana competencia que redundará en mejores ofertas para el consumidor.*

*(b) La Farmacia La Vega ofrecerá sus servicios eficientemente, propiciando la competencia en un mercado que actualmente se concentra en tres farmacias que ofrecen un servicio similar y en el cual no se estimula la*

*competencia y diferenciación de los servicios. Al propiciar la competencia saludable, se estimula la eficiencia operacional de las facilidades de salud.*

*(c) Utilizando el índice de concentración "Herfindahl-Hirschman" se demostró que actualmente, las tres farmacias que operan dentro del área de servicio, exhiben un alto nivel de concentración. La entrada de la Farmacia La Vega reduciría el nivel de concentración actual, promoviendo la competencia y la eficiencia operacional."*

El 16 de marzo de 2000, la Secretaria de Salud acogió la recomendación formulada por el Oficial Examinador y procedió a conceder el certificado solicitado.

## II

Atendemos, en primer lugar, la solicitud de desestimación presentada por la recurrida Farmacia La Vega. La recurrida aduce que las recurrentes incumplieron con el Reglamento del Tribunal de Circuito de Apelaciones al no incluir en el apéndice varios documentos que alega son esenciales para el perfeccionamiento del recurso e indispensables para considerar su revisión. No tiene razón.

La Regla 59 del Reglamento del Tribunal de Circuito de Apelaciones enumera los documentos que deben incluirse en el apéndice de un recurso de revisión. En lo pertinente al apéndice, el inciso (E) dispone:

*"(E) La solicitud incluirá un apéndice que contendrá una copia literal de:*

*(a) Las alegaciones de las partes ante la agencia, a saber: la solicitud original, la querella o la apelación, las contestaciones a las anteriores hechas por las demás partes.*

*(b) ...*

*(c) La orden, resolución o providencia administrativa cuya revisión se solicita, incluyendo las determinaciones de hechos y las conclusiones de derecho en que esté fundada, si las hubiere.*

*(d) Toda moción, resolución u orden necesaria para acreditar la interrupción y reanudación del término para presentar la solicitud de revisión.*

*(e) Toda resolución u orden, y toda moción o escrito de cualquiera de las partes que forme parte del expediente original administrativo, en los cuales se discuta expresamente cualquier asunto planteado en la solicitud de revisión, o que sean relevantes a ésta.*

*(f) Cualquier otro documento que forme parte del expediente original en la Agencia y que pueda ser útil al Tribunal de Circuito de Apelaciones en la resolución de la controversia.*

*(g) ...".*

El Tribunal Supremo ha reiterado que este Tribunal debe ser flexible al interpretar y aplicar las normas procesales y reglamentarias contenidas en su reglamento. *Banco Popular v. Pellicier*, **96 J.T.S. 17**, resuelto el 14 de febrero de 1996; *Santos v. Municipio de Comerío*, **96 J.T.S. 13**, resuelto el 9 de febrero de 1996. Así, también, ha señalado que a tenor con la norma judicial de que los casos se resuelvan en sus méritos, no debemos actuar precipitadamente, ni ordenar rígidamente la desestimación de los recursos de apelación. *Sociedad de Gananciales v. García Robles*, **97 J.T.S. 7**, resuelto el 23 de enero de 1997.

Luego de un examen del apéndice del recurso presentado, vemos que el recurso se perfeccionó conforme lo establece el Reglamento del Tribunal y que la falta de los documentos señalados no nos impiden considerar su revisión. No se trata, como en *Codesí v. Municipio*, **2000 J.T.S. 61**, resuelto el 24 de marzo de 2000, de la falta

de alegaciones, resoluciones u órdenes, ni de la omisión del formulario de notificación. El propósito de la Regla 59 de nuestro Reglamento y de la jurisprudencia que la interpreta, es que este tribunal cuente con los documentos necesarios en el expediente que acrediten nuestra jurisdicción y que nos permitan ejercerla. No estamos ante ese caso. A tenor con las normas expuestas, resulta improcedente desestimar el recurso por tal fundamento.

## III

A los fines de ejercer nuestra función revisora, conviene exponer que lo hacemos bajo el prisma del Derecho Administrativo y de la doctrina de revisión administrativa desarrollada. La Ley de Procedimiento Administrativo Uniforme (en adelante, L.P.A.U.), 3 L.P.R.A. sec. 2165, rige el alcance de la revisión judicial de las decisiones adjudicativas de las agencias administrativas. Dispone en lo pertinente lo siguiente:

*"El Tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio. Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal si se basan en evidencia sustancial que obre en el expediente administrativo."*

De ordinario, al revisar las decisiones de las agencias, este Tribunal le brinda mucha deferencia y respeto a las interpretaciones del estatuto efectuadas por el organismo facultado por ley para velar por su administración y cumplimiento. Ello es así porque éstos cuentan con experiencia y conocimiento en relación con la materia que es de su especialidad. *Fac. de las Ciencias Sociales Aplicadas, Inc. v. Consejo de Educación Superior*, 133 D.P.R. 521 (1993); *Com. de Seguros v. General Accident Insurance Co.*, 132 D.P.R. 543 (1993); *M & V Orthodoncist v. Negociado de Seguridad de Empleo*, 115 D.P.R. 183 (1984).

Sin embargo, esta doctrina no constituye un dogma inflexible que impide la revisión judicial, si no existen las condiciones que sostienen la deferencia. Cuando la interpretación que del estatuto hace la agencia produce resultados inconsistentes o contrarios al propósito de la ley, o afecta sustancialmente derechos fundamentales, el criterio administrativo claramente no puede prevalecer. Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, pág. 505 (Ed. Forum, 1993).

En cuanto a las determinaciones de hechos de las agencias administrativas, la sección 4.5 de la L.P.A.U., 3 L.P.R.A. sec. 2175, recoge la norma tradicional de evidencia sustancial, desarrollada y reiterada por el Tribunal Supremo de Puerto Rico en *Metropolitana S.E. v. ARPE*, 95 J.T.S. 39, resuelto el 10 de abril de 1995, la cual nos impone la obligación de examinar la totalidad de la prueba sometida a la agencia, según consta en el expediente de procedimiento adjudicativo. La evidencia debe ser considerada en su totalidad, incluyendo aquélla que sostiene la decisión administrativa, así como la que menoscaba el peso que la agencia le haya conferido. A tenor con esta norma, los tribunales limitan su intervención a evaluar si la decisión de la agencia es razonable y no si se hizo una determinación correcta de los hechos ante su consideración. De existir más de una interpretación razonable de los hechos, los tribunales, de ordinario, deben sostener la selección de la agencia y no sustituir su criterio por el de la agencia. *Junta de Relaciones del Trabajo v. Línea Suprema*, 89 D.P.R. 846 (1964).

La parte afectada por una decisión adversa, tiene la obligación de convencer al Tribunal de que la evidencia en la cual se basó la agencia al formular sus determinaciones de hechos, no es sustancial, y que existe otra prueba en el récord que reduce o menoscaba el valor probatorio de la evidencia impugnada, hasta el punto que no se pueda concluir que la determinación de la agencia sea razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. *Metropolitana S.E. v. ARPE, supra; Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670 (1953). No obstante, el Tribunal debe sostener la resolución de un conflicto probatorio, siempre que ésta se haya apoyado en una base racional. *Hilton Hotels v. Junta de Salario Mínimo, supra.*

La norma de otorgar gran deferencia y respeto a las interpretaciones de los organismos administrativos especializados, cobra más importancia cuando se revisan los fallos de ciertos organismos que tienen a su cargo

la reglamentación de complejos procesos técnicos, sociales o económicos. *South Puerto Rico v. Junta Azucarera*, 82 D.P.R. 847 (1965). Ciertamente, la otorgación de un CNC es uno de tales procesos.

A la luz de esta normativa, debemos determinar si la actuación del Departamento, al conceder el CNC a la Farmacia La Vega, está apoyada en evidencia sustancial que obre en el expediente administrativo y si la agencia actuó de forma arbitraria e irrazonable al así, concederlo.

## IV

El proceso de expedición de los CNC está regulado por la Ley Número 2 del 7 de noviembre de 1975, 24 L. P.R.A. sec. 334 *et seq.*, según enmendada. El mismo define un CNC como aquel documento emitido por el Secretario de Salud autorizando a una persona a llevar a cabo cualquiera de las actividades cubiertas por las secciones 334 a la 334 (j) de la ley. Al otorgar un CNC, la Secretaria de Salud certifica que la actividad es necesaria para la población que va a servir y que no afecta indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. *Laboratorio Clínico Instituto Central de Medicina Avanzada v. Laboratorio Clínico Borinquen*, **99 J.T.S. 141**, resuelto el 9 de septiembre de 1999.

Esta determinación de la Secretaria de Salud representa la culminación de un proceso evaluativo institucional que combina aspectos de reglamentación y adjudicación y que requiere la evaluación de muchas circunstancias y factores complejos y la ponderación de criterios diversos. *Laboratorio Clínico Instituto Central de Medicina Avanzada v. Laboratorio Clínico Borinquen, supra; Hospital San Pablo v. Hospital Hermanos Meléndez*, 123 D.P.R. 720 (1989).

El artículo 3 de la Ley Número 2, 24 L.P.R.A. sec. 334(b), dispone que el Secretario de Salud establecerá, mediante reglamento, los criterios generales a ser considerados para evaluar una solicitud de CNC. En este proceso, la Secretaria de Salud tomará en consideración: (1) las guías generales establecidas en la Ley Federal; (2) las establecidas en la propia Ley Número 2, y (3) la política pública y estrategia de desarrollo adoptada por la Junta de Planificación de Puerto Rico, incluyendo el Plan de Desarrollo Integral.

A tenor con el mandato legislativo, la Secretaria de Salud adoptó el Reglamento Número 89 del 20 de octubre de 1997 (en adelante, el Reglamento 89). ■ El artículo 6 del Reglamento 89 contiene las guías generales sobre evaluación de solicitudes. A tales fines dispone:

*"En el proceso evaluativo de las solicitudes para la concesión de un Certificado de Necesidad y Conveniencia, el Secretario de Salud tomará en cuenta, en la medida que sean de aplicabilidad al caso, los siguientes factores o criterios evaluativos generales; disponiéndose que en el referido proceso evaluativo, el Secretario mantendrá la discreción necesaria para sopesar y evaluar dichos criterios en aquella forma y manera que mejor facilite la implantación de la Ley Número 2 del 7 de noviembre de 1975, según enmendada, y la política pública del Departamento de Salud:*

*1. La relación entre la transacción para la cual se solicita el certificado y el Plan de Desarrollo de Servicios a largo plazo, si alguno, del solicitante.*

*2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada en los servicios que se proveerán mediante la misma.*

*3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.*

*4. La relación entre el sistema de Salud operante en el área y la transacción propuesta.*

*5. En el caso específico de solicitantes de Certificados de Necesidad y Conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:*

*(a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.*

*(b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.*

*(c) El porciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción.*

*6. El nivel de competitividad y de eficiencia operacional de las facilidades de salud existente en el área de servicio de la acción propuesta.*

*7. El nivel de concentración existente en el área de servicio de la acción propuesta y la medida en que un incremento en la oferta estimule la competencia, en cuyo caso se podría favorecer la acción propuesta."* (Enfasis suplido).

El propósito de este nuevo reglamento es agilizar y expeditar el proceso de consideración y análisis de las solicitudes de los CNC, además de atemperar dicho proceso a la actual política pública en torno a la prestación de servicios de salud en Puerto Rico. Cónsono con lo anterior, el Departamento consideró la solicitud en controversia para establecer un nuevo servicio bajo los criterios generales recogidos en el artículo 6 antes transcrito.

## V

Expuesto el marco conceptual sobre el alcance de la Ley Núm. 2, el Reglamento 89, así como el trasfondo jurisprudencial sobre el alcance de la revisión judicial aplicados a la totalidad de evidencia que obra en autos, concluimos que la decisión del Departamento de conceder el CNC no fue irrazonable y está sostenida por evidencia sustancial apoyada por la prueba que obra en el expediente, particularmente en prueba pericial. El Departamento consideró los criterios generales establecidos en la ley y en el Reglamento 89. Carecemos, pues, de elementos necesarios para sustituir el criterio de la agencia. Veamos.

Consideremos en primer lugar el señalamiento de error a los efectos de que no obra en el expediente evidencia sustancial que sostenga la determinación de la agencia. Los recurrentes aducen que la prueba en el expediente no sostiene las determinaciones de hecho 6(d) y 6(e).

En la vista celebrada, los recurrentes alegaron que existía una merma en la demanda de servicios y que de autorizarse la operación de la nueva farmacia, esto ocasionaría una merma en la demanda aún mayor. El Oficial Examinador concluyó en su resolución que no existía una merma en la demanda de servicios. Basó su determinación en los expedientes oficiales del Departamento de Salud, donde en las solicitudes de renovación de licencia de las recurrentes, no se reflejaba una disminución en el número de recetas despachadas, contrario a lo testificado por las recurrentes.

Las recurrentes alegan en su escrito que en la vista se probó que hubo una disminución en la demanda de recetas de las farmacias recurrentes. Esto a la luz de que el Oficial Examinador aceptó que existía una diferencia entre lo informado por las recurrentes al Departamento de Salud en su solicitud de renovación (año fiscal) y el testimonio de éstas en la vista (año natural). Como consecuencia de la aclaración, las recurrentes alegan que existe una contradicción en la determinación de hecho en la cual el Oficial Examinador estableció que no existió tal disminución. No tienen razón.

El Oficial Examinador pudo concluir a base de los documentos oficiales del Departamento que no existió

tal disminución. Esto, independientemente del testimonio ofrecido por las recurrentes. No podemos sustituir la apreciación de la prueba hecha por el Oficial Examinador. Tampoco resulta ser irrazonable, basándose en documentos oficiales del Departamento, los cuales le merecieron mayor credibilidad que el testimonio ofrecido en la vista. La alegación de que *"el testimonio vertido por los recurrentes se basa en información obtenida sobre el recetario en la recolección de data sobre el número de recetas despachadas e informadas al Departamento de Salud el año fiscal, a diferencia del número de recetas despachadas que declararon los opositores-recurrentes y que éstas fueron obtenidas por año natural y no por año fiscal"*, no abona al argumento de las recurrentes, pues el aumento en actividad comercial es irrespectivo del ciclo utilizado.

Tampoco existe evidencia independiente en el expediente que nos lleve a la ineludible conclusión de que efectivamente hubo una disminución en la demanda. Aún cuando se determinase como cierta tal alegación, este no es el único factor a considerar a los fines de expedir el CNC.

En resumen, determinamos que la agencia no actuó arbitraria, ni irrazonablemente sobre este particular. La parte recurrente no nos pone en condición de alterar la determinación hecha por la agencia.

Por otra parte, las recurrentes no presentan prueba alguna de la insubstancialidad de la determinación de hecho número 6 (e), por lo que a la luz de la norma de revisión expuesta, no procede alterar la determinación de la agencia. Recordemos que le corresponde a la parte que alega que la determinación de la agencia no está basada en la prueba que obra en el expediente, convencer al Tribunal de que existe otra prueba en el expediente que menoscaba la determinación de la agencia *"hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración."* *Misión Industrial v. Junta de Planificación*, **97 J.T.S. 114**, resuelto el 30 de junio de 1997; *Vecinos Pro-Mejoramiento, Inc. v. Junta de Planificación*, **99 J.T.S. 32**, resuelto el 19 de marzo de 1999. De lo contrario, los tribunales estamos llamados a guardar deferencia a la determinación de la agencia.

Las recurrentes señalan, como error, el que, alegadamente, el Oficial Examinador descartara los informes periciales vertidos en la vista. Las recurrentes impugnan, además, las determinaciones de hechos número 7 a la 11, por no estar fundamentadas sobre la prueba pericial desfilada en la vista. Las mismas se limitaron a establecer la necesidad y conveniencia del establecimiento de la farmacia a través de los factores evaluados en el estudio realizado por la perito de la recurrida. Consideramos que las determinaciones de hechos del Departamento no se apartan de la prueba vertida en el expediente, de forma tal que resulte irrazonable su determinación. Recordemos que la determinación que haga la agencia, no tiene que ser la única posible.

Por otra parte, cabe señalar que las calificaciones de los peritos no son objeto de evaluación, toda vez que fueron estipuladas por las partes. ■ El perito de las recurrentes, Dr. Mohinder Bhatia, impugnó la prueba pericial presentada por la recurrida en cuanto a la medición de cambio poblacional, al cálculo del número de recetas expedidas en el Municipio, al costo de venta, a la nómina del negocio, el estimado de ingresos netos, la cantidad de recetas vendidas y la aplicación a comunidades pequeñas del índice de concentración *"Herfindahl-Hirschman."* El Oficial Examinador determinó:

*"[l]as opiniones del perito economista presentado por los opositores, se limitaron a un análisis crítico de los criterios utilizados en el informe pericial y el testimonio de [la] Lcda. Heidie Calero. Criticó las fuentes estadísticas utilizadas y el mecanismo para proyectar los gastos. No obstante, quedó evidenciado que el análisis pericial de la parte proponente se fundó en fuentes oficiales publicadas por agencias estatales (Junta de Planificación) y federales (Departamento de Comercio Federal). En cuanto a los gastos proyectados, determinamos que la imputación fue correcta, ya que los mismos se limitaron al recetario, al igual que los ingresos proyectados."* (Determinación de hecho número 11).

El Oficial Examinador justificó, además, la utilización del instrumento de medición impugnado por el perito de las recurrentes al indicar que la entrada de una farmacia adicional *"reduciría el nivel de concentración*

*actual, promoviendo la competencia y la eficiencia operacional."* (Conclusión de derecho número 4(c)).

Habida cuenta de lo señalado, no podemos concluir que las determinaciones de hechos carezcan de fundamento. La deferencia que nos merece el foro administrativo no nos mueve a interferir con sus determinaciones de hechos, ni con sus conclusiones de derecho. Mucho menos cuando se trata de la apreciación de elementos técnicos para los cuales la agencia tiene una especialidad particular. Nuevamente hacemos énfasis en la doctrina general de derecho administrativo de actuar con deferencia respecto a las determinaciones de hechos y conclusiones de derecho emitidas por la agencia. El propósito de esta norma es evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor. *Reyes Salcedo v. Policía de Puerto Rico,* **97 J.T.S. 58**, resuelto el 13 de mayo de 1997. Debemos sostener la interpretación administrativa, siempre que ésta encuentre apoyo en una base racional, aun cuando esa interpretación no sea la única razonable. El criterio rector de nuestra función revisora, es el de la razonabilidad, por lo que estamos obligados a confirmar las interpretaciones administrativas, siempre que la agencia no haya actuado ilegal o arbitrariamente, o en abuso de su discreción. La agencia recurrida no actuó mediando abuso de discreción.

Las recurrentes señalan que el oficial Examinador erró al no tomar conocimiento oficial de ciertas resoluciones emitidas por el Departamento. No tienen razón.

En la vista evidenciaria celebrada por el Departamento, las recurrentes solicitaron, durante el interrogatorio directo a la Lcda. Carmen I. Rivera Cintrón, propietaria de la Farmacia Del Carmen, que se tomara conocimiento oficial de las resoluciones negativas emitidas en torno a las propuestas Núm. 95-04-107, el 12 de julio de 1996; 89-01-292, del 12 de julio de 1990; y 90-01-033, del 10 de octubre de 1990. Las resoluciones ofrecidas como prueba, fueron emitidas al amparo del Reglamento Núm. 56, que fue derogado el 16 de octubre de 1997 y sustituido por el Reglamento Núm. 89, de aplicación al caso de marras, que mantuvo los requisitos generales, pero eliminó los requisitos de proporción específica a la cantidad de habitantes en el municipio o el área objeto de estudio.

La recurrida objetó la oferta de prueba realizada sobre el fundamento de que las recurrentes no habían anunciado y que la oferta no identificaba las propuestas numéricamente, sino que se hacía una referencia genérica a su denegación. De hecho, al ser inquirido por el Oficial Examinador, el asesor legal de las recurrentes no puso al Oficial Examinador en condición adecuada de evaluar si procedía tomar conocimiento oficial sobre tales resoluciones. La objeción se declaró con lugar. El reclamo de las recurrentes se reduce que se le causó perjuicio al no integrar al expediente la información referente a la falta de necesidad y conveniencia de farmacias adicionales en el área en la cual se proponía establecer la recurrida.

La L.P.A.U. dispone que *"[el] funcionario que presida la vista podrá tomar conocimiento oficial de todo aquéllo que pudiera ser objeto de conocimiento judicial en los tribunales de justicia."* 3 L.P.R.A. sec. 2163 (d). Al respecto, la Regla 11 de las de Evidencia, 32 L.P.R.A. Ap. IV, R.11, indican cuándo y cómo los tribunales habrán de tomar conocimiento judicial de hechos adjudicativos. Requiere que la parte proponente provea al tribunal con información suficiente para permitirle tomar tal conocimiento. Además, la parte que solicita que se tome conocimiento judicial de un hecho, debe notificar la solicitud a la parte adversa para dar oportunidad a ésta de prepararse y enfrentarse a su solicitud, si así lo estima conveniente. Una parte tiene derecho a ser oída en torno a si procede tomar conocimiento judicial. Ciertamente, en el caso ante nos, no se le dio oportunidad previa a las recurridas para evaluar tal solicitud. Tampoco estuvo preparada la parte recurrente como para informar al Oficial Examinador certeramente sobre lo solicitado, de forma tal que éste tuviera los elementos adecuados ante sí.

Como señaláramos, aun cuando procediese tomar conocimiento judicial de los hechos que constan en los expedientes mencionados, para que puedan ser objeto de exacta e inmediata demostración recurriendo a fuentes de fácil acceso y de indisputable precisión, el proponente tenía que dar a la otra parte, Farmacia La Vega, una oportunidad razonable para que sometiera información en cuanto a si procedía tomar conocimiento judicial de

esa materia y además respecto a su contenido. Aclaramos, sin embargo, que la consideración de las alegadas resoluciones denegando las solicitudes previas, no necesariamente hubiese significado que el Departamento, al tomarlo en cuenta, hubiese tomado una decisión distinta de la cual se recurre.

Finalmente, las recurrentes imputan, como error, el que el Departamento otorgara el C.N.C. sin que se hubiesen otorgado los permisos de ARPE.

Como señaláramos, los C.N.C. son concedidos por el Departamento de Salud en virtud de la Ley Núm. 2. Dicha Ley, al ser aprobada, disponía que la evaluación de la Junta de Planificación era necesaria para la concesión de los C.N.C. Mediante la Ley Núm. 16 del 19 de septiembre de 1983, dicho requisito fue derogado, y se mantuvo el criterio general de que la concesión de los C.N.C. siguiera "*la política pública y estrategia de desarrollo adoptadas por la Junta de Planificación, incluyendo el Plan de Desarrollo Integral.*" 24 L.P.R.A. sec. 334b. La Legislatura estableció:

"*[p]ara determinar la necesidad y la conveniencia de una facilidad o de un servicio, no es necesario considerar la ubicación exacta del mismo. Por lo tanto, las gestiones que antes se hacían ante la Junta de Planificación y que fueron transferidas a la Administración de Reglamentos y Permisos (ARPE), se realizarán después de determinada la necesidad y conveniencia de la facilidad. Informe Conjunto de las Comisiones de lo Jurídico y de Salud, Bienestar y Calidad Ambiental del Senado de Puerto Rico sobre el P. del S. 827, 9 de mayo de 1979.*"

El Reglamento 89, cuya preparación fue autorizada por la sección recién transcrita, establece los reglamentos que regulan el proceso de evaluación de solicitudes, y como mencionáramos, sustituyó el Reglamento Núm. 56. Al sustituirlo, el Departamento mantuvo los criterios generales, pero eliminó una serie de requisitos específicos. Al así hacerlo, el Departamento se proveyó de mayor flexibilidad en la concesión de los C.N.C.

La recurrente fundamenta su argumento exclusivamente sobre jurisprudencia interpretativa de la norma general de conformidad con la política pública, más nos solicita que le demos un alcance equivalente a obviar la enmienda practicada en 1983. Ciertamente, no le corresponde a los tribunales añadir ni limitar lo establecido por la ley y los reglamentos, ni mucho menos sustituir la política pública establecida. Por lo que no siendo la expedición del permiso de A.R.P.E. condición *sine qua non* para la otorgación de un C.N.C., no procede que revoquemos la determinación de la agencia.

En síntesis, en virtud de la prueba vertida en la vista administrativa que mereció credibilidad al Oficial Examinador, de los informes periciales presentados por las partes y de las circunstancias consideradas y evaluadas por la agencia sobre las cuales fundamentó su determinación de conceder el CNC a la recurrida, no vemos que la agencia haya actuado irrazonablemente. Por lo que a la luz de la doctrina de derecho administrativo, no existe fundamento que nos lleve a alterar la determinación de la agencia.

Por los fundamentos expresados, denegamos la expedición del auto de revisión solicitado.

El Juez Ortiz Carrión disiente sin opinión escrita.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

## ESCOLIOS 2001 DTA 116

**1.** KLRA-99-00108.

**2.** El Reglamento Núm. 89 del 16 de octubre de 1997 derogó el Reglamento Núm. 56 del 15 de agosto de 1986.

**3.** Resulta importante señalar que el rango académico de un perito no determina su conocimiento específico sobre un área particular de la economía.