# 2008 DTA 93

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE UTUADO**
**PANEL ESPECIAL**

CENTRO DE CIRUGÍA AMBULATORIA DE LA MONTAÑA DEL CDT DR. CAPARRÓS
Recurrido

v.

SOUTHWEST HEALTH CORP. H/N/C CDT METROPOLITANO DE ARECIBO; HOSPITAL DR. SUSONI, INC. H/N/C HOSPITAL DR. SUSONI Y DR. SUSONI HEALTH COMMUNITY SERVICES CORP. H/N/C HOSPITAL DR. CAYETANO COLL Y TOSTE
Recurrentes

Núm. KLRA-07-01257

San Juan, Puerto Rico, a 14 de julio de 2008

Panel integrado por su Presidente, el Juez Rivera Martínez,
el Juez Colón Birriel y la Juez Jiménez Velázquez

Rivera Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparecen ante nos Southwest Health Corp. h/n/c CDT Metropolitano de Arecibo; Hospital Dr. Susoni, Inc. h/n/c Hospital Dr. Susoni y Dr. Susoni Health Community Services Corp. h/n/c Hospital Dr. Cayetano Coll y Toste (en adelante parte recurrente) mediante recurso de revisión administrativa en el que solicitan que revoquemos la resolución emitida por el Departamento de Salud (en adelante Departamento) el 19 de octubre de 2007. Mediante la misma se le otorgó al Centro de Diagnóstico y Tratamiento Dr. Caparrós, Inc. (en adelante CDT Dr. Caparrós) un certificado de necesidad y conveniencia para el establecimiento de un centro de cirugía ambulatoria en sus facilidades localizadas en el Municipio de Utuado.

Examinadas las comparecencias de las partes, la transcripción de la vista celebrada, así como el derecho aplicable, procedemos a confirmar la resolución recurrida.

**I**

El CDT Dr. Caparrós presentó ante el Departamento una solicitud para obtener un certificado de necesidad y conveniencia para establecer en sus facilidades un centro de cirugía ambulatoria. La parte recurrente se opuso a dicha solicitud. Luego de varios trámites procesales, el 23 de mayo y 6 de junio de 2007 se celebró la vista correspondiente. En la misma declararon, por parte del CDT, Dr. Caparrós, el Dr. Juan Caparrós, Director Administrativo y médico de dicha entidad, y el señor Pedro J. Santiago, perito economista que preparó el Estudio de Viabilidad para el centro propuesto. Por la parte recurrente testificó el señor Agustín González Feliciano, vice-presidente de finanzas de Southwest Health Corp.

Aquilatada la prueba testifical y documental, la oficial examinadora emitió su informe y recomendó la concesión del certificado solicitado. En dicho informe se formularon las siguientes determinaciones de hechos, las cuales transcribimos a continuación:

*"1. El proponente en este caso llevaría a cabo el servicio de cirugía ambulatoria con tres salas de operaciones, a ubicarse en el ya establecido CDT Dr. Caparrós en Utuado, Puerto Rico, con el nombre de Centro de Cirugía Ambulatoria de la Montaña.*

*2. A los pacientes del CDT y a la población del área de servicio se les ofrecerían procedimientos de cirugía ambulatoria al costo más económico y mejor calidad posible. Esto se lograría con personal cualificado utilizando equipo moderno y sofisticado de intervenciones quirúrgicas.*

*3. El CDT Dr. Caparrós, Inc., entidad que establecería el servicio propuesto, y sus profesionales, cuentan con los recursos, calificaciones y experiencia requerida para operar, desarrollar y dirigir este proyecto. De hecho, administra el "IPA" de Utuado hace doce (12) años. Se harían procedimientos ambulatorios con el fin de eliminar o abreviar hospitalizaciones y ofrecer servicios quirúrgicos a menor costo, facilitando el acceso de un mayor número de personas al sistema de salud. Las ventajas incluyen costos más bajos de intervención, menos y menores estadías, recuperaciones prematuras y menores riesgos de infecciones.*

*4. Según explicó el Dr. Caparrós, la cirugía ambulatoria mayor es una super-especialidad médica que usa técnicas quirúrgicas relativamente seguras y costo efectivas para tratar pacientes que de otra forma tendrían que permanecer hospitalizados y sufrir de mayor posibilidad de muerte. Los procedimientos propuestos toman típicamente de quince minutos a dos horas. Por ejemplo, los breves procedimientos analgésicos epidurales proveen manejo del dolor efectivamente, disminuyen la incidencia de complicación pulmonar y cardiovascular, promueven el alta temprana del paciente, disminuyen las visitas a sala de emergencia y le devuelven al paciente sus funciones físicas normales.*

*5. Estos procedimientos se llevarían a cabo en el ambiente estéril de salas quirúrgicas. El personal médico involucrado seguirá las pautas de prevención de contaminación universal y conocerán el equipo especializado en uso.*

*6. La cirugía ambulatoria se realizaría únicamente por cirujanos certificados y asistidos por anestesiólogos y enfermeras especializadas.*

*7. Se mostraron cotizaciones para máquina EKG, monitor desfibrilador, autoclave, máquina de succión, máquina de anestesia, tablas quirúrgicas y lámpara de examen. El Dr. Caparrós indicó que podría necesitarse equipo adicional no contemplado en las cotizaciones, pero que esto dependería de los procedimientos a efectuarse que aún no están planificados.*

*8. Aunque el área de servicios de la facilidad propuesta según el Reglamento Núm. 122, infra, es la sub-región de Arecibo, comprendida por Arecibo, Camuy, Hatillo, Lares, Quebradillas y Utuado, el municipio base para el servicio quirúrgico propuesto (Utuado) bordea siete municipios: Adjuntas, Arecibo, Ciales, Hatillo, Jayuya, Lares y Ponce. Por tanto, la población de 284,755 habitantes proyectados para julio de 2007 es sólo un mínimo de la cantidad de personas que, en la realidad, tendrían acceso a los servicios propuestos.*

*9. El servicio de CCA estaría ubicado en el primer piso del ya establecido CDT Dr. Caparrós, en el mismo casco del pueblo de Utuado. Se nos mostró un mapa donde pudimos ubicar su ubicación.*

*10. El servicio del CCA estaría a menos de un tercio de milla del Hospital y Centro de Salud de Utuado por lo que el primero podría servir de apoyo a los demás servicios médicos que se encuentran allí, una vez reanude*

*operaciones, toda vez que actualmente no esta [sic] operando.*

*11. Igualmente, se presentó en evidencia un acuerdo entre el CCA y el Doctor's Hospital para que el hospital le sirva de base a los pacientes de la facilidad propuesta. Este hospital está a aproximadamente treinta (30) minutos del CDT proponente. Sin embargo, el CDT Dr. Caparrós, donde ubicaría la facilidad, tiene una sala de emergencias. Según el Dr. Caparrós, es a sala de emergencia donde normalmente se refiere un paciente con alguna complicación post operatoria, por lo que en primera instancia esa necesidad estaría cubierta.*

*12. Según el perito, la Junta de Planificación estimó que la sub-región tendría 282,749 habitantes en 2006. La población de la sub-región aumentó entre 1990 y 2000 en 29,076 habitantes según el Censo Federal, produciendo un cambio porcentual de 12.1%. Esto corresponde a una tasa de aumento poblacional casi 50% mayor que para toda la isla.*

*13. Igualmente, la sub-región de Arecibo tiene el 56% de la población de la Región Norte del Departamento de Salud, casi dos terceras partes del área geográfica.*

*14. Se demostró que los municipios de la sub-región de Arecibo de Salud cuentan con una proporción 3.2% mayor de personas mayores de 49 años que el total proporcional para la Isla. Estas [sic] situación es aún más extrema en los municipios de Arecibo y Utuado, donde hay 7.8 y 6.4 % más personas mayores de 49 años de edad que en Puerto Rico, proporcionalmente hablando. Se observa más en la Sub-región de Arecibo que en Puerto Rico, una transformación de una sociedad mayormente joven, a una población vieja. Se puede inferir entonces que existe mayor demanda de servicios de cirugía ambulatoria allí al compararse con otras áreas de salud y el total de Puerto Rico.*

*15. En total, hubo 31,054 personas mayores de 64 años en la sub-región de Arecibo en el año 2000. Esta cifra representa el 7.3% de este grupo de edad en Puerto Rico. El 11.5% de la población total de la sub-región tiene 64 años de edad o más.*

*16. Puerto Rico enfrenta problemas de salud mayormente asociados a un estilo de vida inadecuado, tal como la mala nutrición, la vida sedentaria, el tabaquismo, alcoholismo, drogadicción y variaciones significativas a los estándares éticos y morales de las generaciones más recientes en comparación con las pasadas.*

*17. En 1998, a nivel de área o sub-región, la sub-región de Arecibo fue una de las de mayor tasa de mortalidad. La tasa de mortalidad general de Puerto Rico fue de 782.3 por cada 100,000 habitantes; para la sub-región de Arecibo, esta cifra alcanzó 836.5 en 1998. El área bajo estudio fue la de mayor mortalidad por causa de enfermedades del corazón, diabetes mellitus, enfermedades pulmonares y septicemia, además de ser la segunda en cáncer.*

*18. Según datos estadísticos suplidos por el perito, en 2006 existía una tasa reglamentaria de 120 cirugías ambulatorias por cada 1,000 habitantes. Dividido entre la población de 282,749 del área de servicio, se arrojaría una demanda de 33,930 cirugías ambulatorias para la sub-región de Arecibo. Se estima entonces que para los años de 2006-2010, el número de cirugías ambulatorias aumente 0.64% anualmente, la tasa de aumento de la población, hasta alcanzar 34,805 casos al final de este período. Se proyecta que el área de servicio habrá de tener una población de 290,515 personas en el 2010.*

*19. Según el Dr. Caparrós, en Utuado no se realizan cirugías desde los años '70. Desde entonces, los habitantes del municipio han tenido que moverse a otros municipios para obtener esos servicios.*

*20. Los hospitales existentes en el área de servicio son el Hospital El Buen Pastor, el Hospital Metropolitano, el Hospital Dr. Susoni, y el Hospital Cayetano Coll y Toste. De estos [sic], solamente dos efectúan "algún*

*tipo" de cirugías ambulatorias: el Hospital Metropolitano y el Hospital Dr. Susoni. Pero, según la Declaración de Información Estadística de estos centros quirúrgicos, ninguno se dedica en un 80% o más a realizar procedimientos ambulatorios. De hecho, el Metropolitano no tiene todas sus salas operando.*

*21. Por tanto, se puede concluir que no existen facilidades de salas de cirugía ambulatoria operando en el área de servicio. Con la facilidad del Centro de Salud de Utuado, al no estar operando, no puede establecerse que sus salas operen en exceso de un 95%, según requiere el Reglamento Núm. 112, infra.*

*22. Surge del informe económico que, según la data oficial más reciente del "Centres for Disease Control and Prevention", el 84% de las cirugías ambulatorias se efectúan en centros anexos a hospitales. Por lo tanto, se esperarían entonces alrededor de 28,500 intervenciones quirúrgicas disponibles para los cinco hospitales en el área de servicio, aun cuando los hospitales Hospital General de Utuado, Hospital Castañer de Lares y Hospital Buen Pastor de Arecibo no efectúan estos procedimientos.*
*23. Hay una demanda insatisfecha de salas ambulatorias en la sub-región de Arecibo.*

*24. La mediana de ingreso de los 89,889 hogares de la sub-región de Arecibo fue de $11,848 en 1999, un 17.8% menos que la mediana de ingreso para Puerto Rico. Ninguno de los municipios del área alcanzó la mediana de nivel de ingresos de $14,412 representativa para toda la isla. En febrero de 2005, el Municipio de Utuado tenía una tasa de desempleo de 12.7%.*

*25. Ante este cuadro, el centro propuesto aceptaría todos los planes médicos, y persigue proveer un mejor acceso de los servicios médicos a los pacientes cubiertos bajo el Seguro de Salud del Gobierno de Puerto Rico (Plan de Reforma) y Medicare. También, el servicios de CCA trabajará en estrecha colaboración con grupos médicos del área para proveer el servicio a toda la población que tenga la tarjeta de la Reforma de Salud, y tomando en consideración que el CDT ya administra el IPA.*

*26. En noviembre de 2004, el número de vidas en la Reforma de Salud de la sub-región de Arecibo era de 120,827. En cuanto a beneficiarios de Medicare, existen alrededor de 28,000 de las 35,000 personas entre envejecientes e incapacitados en el área de servicio.*

*27. Por otro lado, los cargos a pacientes serían competitivos y se acordarían dentro de un mercado de libre competencia y selección con los planes médicos. Las tasas de pago por servicios quirúrgicos estarían reguladas según los contratos que se acuerden entre los planes médicos y el proponente.*

*28. El reembolso que le pagarían los planes de salud al CCA para el 2006, se estimó utilizando el promedio de los tres procedimientos que según el proponente con más frecuencia se practicarían allí, siendo éstos los siguientes: vesículas, $548.79, histerectomía con Salpingo, $658.34. El promedio de estos tres procedimientos equivale a $583.93.*

*29. El perito calculó esta tasa de pago y asumió que ésta cambiaría en un 5% anual. Considerando las cuentas incobrables en un 2.5%, calculó los ingresos de la facilidad proponente para el primer año de operación en $1,545,937, por lo que desde sus comienzos, los servicios de CCA generarían ingresos suficientes para operar con solvencia.*

*30. Se comprobó que el proponente está financieramente capacitado para asumir la inversión de capital y los gastos operacionales de CCA.*

*31. El CCA sería viable económicamente dentro de los parámetros del área de servicio a base de los cinco (5) años proyectados por el perito y su operación generaría un rendimiento razonable que permitiría la oferta de servicios de cirugía ambulatoria de calidad.*

*32. La facilidad propuesta estaría operando en aproximadamente un año desde que se le conceda el permiso.*

*33. El servicio de cirugía ambulatoria propuesto beneficiaría a la comunidad de pacientes y los proveedores de servicios de salud tendrían alternativas competitivas donde referir sus pacientes. En adición, la transacción propuesta generaría varios empleos de servicios de salud y su efecto multiplicador añadiría beneficios a un área con necesidad de oportunidades de desarrollo."*

La Secretaria del Departamento acogió el referido informe por lo que el 19 de octubre de 2007, notificada el 23 de octubre de 2007, se emitió la resolución recurrida mediante la que se le otorgó al CDT Dr. Caparrós el certificado de necesidad y conveniencia para establecer el Centro de Cirugía Ambulatoria de la Montaña. Inconforme, la parte recurrente presentó el recurso que nos ocupa. Sostiene que:

*"Erró el Departamento de Salud al no basar la totalidad de sus determinaciones de hechos en evidencia sustancial que obra en el expediente administrativo. A esos efectos, se otorgó un certificado de necesidad y conveniencia de forma caprichosa y arbitraria, sin base para determinar la conveniencia y viabilidad financiera del proyecto en cuestión."*

## II

Es principio reiterado que las conclusiones e interpretaciones de los organismos administrativos merecen gran deferencia por parte de los tribunales. *Vélez Rodríguez v. A.R.P.E.*, 167 D.P.R. \_\_, **2006 JTS 78**; *Otero Mercado v. Toyota de Puerto Rico*, 163 D.P.R. \_\_, **2005 JTS 13**; *Rivera Concepción v. A.R.P.E.*, 152 D.P.R. 116, 122-123 (2000); *Assoc. Ins. Agencies, Inc. v. Com. de Seguros*, 144 D.P.R. 425, 436 (1997). Debemos ser cautelosos al intervenir con las determinaciones administrativas, debido a que las agencias poseen la experiencia y los conocimientos altamente especializados que se encuentran dentro del ámbito de sus facultades y responsabilidades. *Rebollo Vda. de Liceaga v. Yiyi Motors*, 161 D.P.R. 69 (2004); *Pacheco Torres v. Estancias de Yauco*, 160 D.P.R. 409, 431 (2003). Por tanto, se establece una presunción de legalidad y corrección a favor de las agencias administrativas. *A.R.P.E. v. Junta de Apelaciones sobre Construcciones y Lotificaciones*, 124 D.P.R. 858, 864 (1989); *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975).

Sin embargo, debe quedar claro que la norma de impartir deferencia a la interpretación que hace una agencia del estatuto o reglamento que está bajo su administración es una de hermenéutica, que de ningún modo afecta el alcance de la facultad de revisión de los tribunales. *Padín Medina v. Administración de los Sistemas de Retiro*, 172 D.P.R. \_\_, **2007 JTS 151**. Tal intervención sólo estará justificada cuando la agencia obre de manera arbitraria, ilegal, en forma tan irrazonable que su actuación constituya un abuso de discreción, cuando la determinación no se sostenga mediante prueba sustancial, o cuando se haya cometido un error en la aplicación de la ley. *Fuertes v. A.R.P.E.*, 134 D.P.R. 947, 953 (1993); *Murphy Bernabé v. Tribunal Superior, supra*, a la página 699.

Como norma básica, los tribunales tenemos la obligación de exigir que la conclusión administrativa se apoye explícitamente en la razón y en la ley. Además, de formar parte de un patrón integrado de reglamentación. *South P.R. Sugar Co. v. Junta*, 82 D.P.R. 847, 865 (1961). Debemos indagar sobre la razonabilidad de la decisión administrativa y no sustituir el criterio de dicho organismo a menos que se infrinjan valores constitucionales fundamentales. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521, 533 (1993). Cuando obre en el expediente administrativo evidencia sustancial que haya sido considerada en su totalidad, los tribunales apelativos debemos confirmar las determinaciones de hechos realizadas por la agencia. 3 L.P.R.A. 2175; *Metropolitana S.E. v. A.R.P.E.*, 138 D.P.R. 200, 213 (1995). El Tribunal Supremo ha definido la evidencia sustancial como evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Padín Medina v. Administración de los Sistemas de Retiro, supra.*

De acuerdo con esta norma, la parte que impugna la determinación de la agencia tiene el peso de probar que dicha determinación fue arbitraria, irrazonable y que se tomó en ausencia de evidencia sustancial. Tiene la obligación de refutar la presunción de corrección sin descansar en meras alegaciones. *Com. Vec. Pro-Mej., Inc. v. Junta de Planificación*, 147 D.P.R. 750, 761 (1999); *Misión Industrial de Puerto Rico v. Junta de Planificación*, 146 D.P.R. 64, 131 (1998). Debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada."* D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Colombia, Forum, 2001, a la página 543; *Metropolitana S.E. v. A.R.P.E*, *supra*, a la página 213, citando a *Hilton Hotels v. Junta de Salario Mínimo, supra*, a la página 686. Si en la solicitud de revisión la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hechos de la agencia deben ser sostenidas. *Domínguez v. Caguas Expressway Motors*, 148 D.P.R. 387, 398 (1999), citando a *Ramírez v. Depto. de Salud*, 147 D.P.R. 901, 905 (1999). La parte recurrente tiene la obligación de demostrar claramente que la decisión de la agencia no está justificada por una evaluación justa de la prueba.

En lo pertinente al caso ante nuestra consideración, la Ley de Certificados de Necesidad y Conveniencia, Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sec. 334 *et seq.*, establece como requisito para el establecimiento y operación de una facilidad de salud poseer un certificado de necesidad y conveniencia. Con esta ley, lo que la Asamblea Legislativa ha intentado es regular la planificación ordenada de algunas facilidades y servicios de salud para que, de este modo, se puedan atender adecuadamente las necesidades de salud de la población, controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios. *Asoc. Fcias. Com. v. Depto. de Salud*, 156 D. P.R. 105 (2002). El Secretario del Departamento, al otorgar o denegar un certificado de necesidad y conveniencia, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud. *Ruiz Hernández v. Mahiques*, 120 D.P.R. 80, 89 (1987).

La referida legislación establece que ninguna persona podrá adquirir o construir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud, o hacer inversiones de capital por o a favor de una facilidad de salud o adquirir equipo médico altamente especializado sin antes haber obtenido un certificado de necesidad y conveniencia otorgado por el Secretario. 24 L.P.R.A. sec. 334a. El Tribunal Supremo ha señalado que la decisión de otorgar o denegar un certificado de necesidad y conveniencia surge de un proceso evaluativo institucional, que culmina con la decisión personal del Secretario de Salud. *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 D.P.R. 720 (1989). Se trata de un proceso que requiere la evaluación de muchas circunstancias y factores complejos, y la ponderación de varios criterios diversos. Así, la decisión final del Secretario no puede tomarse sin antes sopesar numerosos elementos y pasar juicio sobre distintas consideraciones, para entonces determinar qué es lo que más conviene al interés general y al bien común. *Ruiz Hernández v. Mahiques, supra*.

Entre las guías o criterios generales que el Secretario habría de tomar en cuenta al determinar si otorgar o denegar un certificado de necesidad y conveniencia figuran:

*"(1) La relación entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno, del solicitante.*

*(2) La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.*

*(3) La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.*

*(4) La relación entre el sistema de salud operante en el área y la transacción propuesta.*

*(5) En el caso específico de solicitantes de certificados de necesidad y conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:*

*a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.*

*b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.*

*c) El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción."* 24 L.P.R.A. sec. 334b.

En virtud de la ley, se le impuso al Secretario la obligación de establecer mediante reglamento los criterios para expedir o denegar un certificado de necesidad y conveniencia. Así pues, se promulgó el Reglamento Para Regir el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia, Reglamento Núm. 112, en el cual se integraron los criterios antes citados. Mediante este reglamento se estableció el procedimiento para el recibo y evaluación de las solicitudes de los certificados de necesidad y conveniencia, así como las guías generales para la evaluación de las mismas.

Según el Artículo V del Reglamento, entre los documentos que debe incluir toda solicitud para la obtención de un certificado de necesidad y conveniencia están:

*"b . Una certificación indicando el nombre, dirección postal y la dirección física de todas aquellas facilidades de salud del mismo tipo, existentes en el área de servicio correspondiente, según el tipo de facilidad de salud a establecerse. En el caso de aquellas facilidades de salud cuya área de servicio sea la milla radial, además deberá incluir con la solicitud, un mapa de zonificación certificado por un agrimensor licenciado o un ingeniero civil, indicando el radio de la milla y las facilidades de salud localizadas en la milla correspondiente.*

*c. Evidencia de que el local o lugar propuesto tiene una zonificación que permite el establecimiento del servicio de salud que se solicita; del local no ser propiedad del solicitante, se deberá acompañar un compromiso de arrendamiento, por escrito, de parte del propietario del mismo. En caso de ser un proyecto a ser construido a partir de la obtención del certificado de necesidad y conveniencia, se incluirá evidencia de las gestiones que certifican que el proyecto podrá obtener los permisos necesarios para su construcción, de las agencias pertinentes.*

*d. Evidencia de que el solicitante podrá reclutar personal técnico especializado con la capacidad profesional necesaria para operar la facilidad de salud solicitada, incluyendo las posibles fuentes de donde provendrá el personal a ser contratado*

*e. Un estudio de viabilidad económica del proyecto, el cual deberá incluir un análisis de la viabilidad funcional y operacional de la acción propuesta, a la luz de las disposiciones de este Reglamento, así como el impacto de la misma, si alguno, en relación con las facilidades de salud existentes en el área de servicio de la acción propuesta. El estudio incluirá además un análisis financiero, con una descripción de la metodología utilizada, una descripción del área de servicio que incluya la oferta y demanda del área a ser servida y el impacto socioeconómico de la propuesta. El estudio incluirá un análisis sobre la capacidad que las facilidades existentes puedan tener de atender la demanda existente de los servicios a ofrecerse. El estudio de viabilidad del proyecto realizará su análisis en consideración al área de servicio que aplique según la facilidad de salud solicitada.*

...

*u. Para el análisis de solicitudes para el establecimiento de hospitales generales, bancos de sangre, laboratorio histopatológico, facilidades de cuidado extendido, diálisis hospitalario y ambulatorio, resonancia magnética, centro de rehabilitación, centro de diálisis renal ambulatorio, centro de cirugía ambulatoria, casa de salud, tomografía computadorizada, angiografía y medicina nuclear, se considerará la Sub-región de salud como el área de servicio básica ."*

Por su parte, el Artículo VI detalla unas guías o criterios generales para la evaluación de la solicitud de un certificado de necesidad y conveniencia. Valga señalar que, previo a esbozarse los criterios, se indica que el Secretario de Salud mantiene *"la discreción necesaria para sopesar y examinar dichos criterios, en aquella forma y manera que facilite el poner en vigor las disposiciones de la Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, y la política pública del Departamento de Salud"*. Se añade que el Secretario *"tendrá discreción para atemperar, modificar o paralizar la aprobación de certificados de necesidad y conveniencia, según sea necesario, para garantizar la salud de la población y el mejor acceso a los servicios de salud"*.

Por último, en el Artículo VII del Reglamento Núm. 112 se indica que el proponente debe presentar la información y evidencia necesaria para probar que reúne los criterios generales junto con los particulares que apliquen en su caso. Para efectos de un centro de cirugía ambulatoria, los criterios particulares son los siguientes:

*"1-Se establece una tasa de 120 cirugías ambulatorias por cada 1000 habitantes.*

*2-Se aplicará la tasa a la proyección de población para el año en que se contempla comenzar la operación de la facilidad. Se multiplicará este resultado por 1 .5 horas (tiempo promedio de este tipo de procedimiento y su recuperación) El resultado se dividirá entre 1,164 (80% de la capacidad en horas de una sala de cirugía) para obtener la demanda por salas de cirugía en el área de servicio.*

*3-Al considerar las facilidades del área de servicio, se incluirán las salas de hospitales que están dedicadas en un 80% a realizar procedimientos ambulatorios.*

*4-Se requerirá un mínimo de tres (3) salas de cirugía ambulatoria por facilidad.*

*5-La facilidad deberá someter evidencia de acuerdos con un hospital para ofrecer servicios de emergencia a pacientes que lo puedan necesitar y deberá estar a 30 minutos de ese hospital con el que tiene el acuerdo.*

*6-Cualquier facilidad establecida que contemple aumentar el número de salas de operaciones, deberá demostrar con la solicitud que las salas autorizadas operan un 95% del tiempo, durante 10 horas diarias, por 5 días a la semana.*

*7-Para aprobar cualquier aumento en la capacidad de una facilidad existente, se tendrá que demostrar que el mismo no conlleva un exceso de oferta para el área de servicio."*

### III

En este caso, la parte recurrente alega que las determinaciones de hechos emitidas en la resolución recurrida no estuvieron basadas en evidencia sustancial que obrara en el expediente administrativo y que, por ende, el certificado de necesidad y conveniencia concedido al CDT Dr. Caparrós lo fue de forma caprichosa y arbitraria. Luego de un análisis detenido de la totalidad del expediente administrativo, así como de la transcripción de la vista, entendemos que la determinación de otorgar el referido certificado está debidamente apoyada en fundamentos razonables obrantes en el récord. La prueba, testifical y documental, constituye evidencia

sustancial y suficiente para sustentar plenamente la decisión de la Secretaria del Departamento de otorgarle el certificado de necesidad y conveniencia al CDT Dr. Caparrós. Las determinaciones de hechos que realizó la agencia estuvieron basadas en evidencia sustancial que obraba en el expediente que tuvo ante sí luego de la celebración de la vista administrativa y están correctamente sustentadas por la evidencia desfilada y los testimonios vertidos por las partes. La parte recurrente no ha demostrado la irrazonabilidad o arbitrariedad de la decisión, por lo que tampoco estamos en posición de intervenir con el criterio de la agencia. Por lo tanto, no se cometió el error señalado.

En este caso, la Secretaria del Departamento acogió las determinaciones y conclusiones suscritas por la oficial examinadora que ventiló el procedimiento relacionado a la solicitud del CDT Dr. Caparrós. Ésta consignó en su informe que la propuesta de dicha entidad para el establecimiento de un centro de cirugía ambulatoria cumplió con todos los criterios establecidos reglamentariamente y por ley para ello. Surge también del expediente que se presentó a la consideración del Departamento un estudio de viabilidad económica, funcional y operacional de la acción propuesta por el CDT Dr. Caparrós.

La información referente a los criterios establecidos para la concesión del certificado solicitado fue objeto de examen por el Departamento, quien, en el ejercicio de las facultades que le confiere la ley, tanto reglamentarias como adjudicativas, aquilató la prueba y determinó que estaba acreditada la necesidad y conveniencia del centro de cirugía ambulatoria propuesto por el CDT Dr. Caparrós. Observamos que toda la información que obra en el expediente denota que se atendieron los requisitos generales y particulares que exigen las disposiciones legales y reglamentarias pertinentes para evaluar la concesión de un certificado de necesidad y conveniencia para operar un centro de cirugía ambulatoria.

Como se señala en el informe rendido por la oficial examinadora, la prueba presentada por el CDT Dr. Caparrós demostró la viabilidad económica del centro puesto. Asimismo, dicha entidad demostró contar con el personal médico necesario. No menos importante, se demostró la necesidad, conveniencia y comodidad del establecimiento del centro de cirugía ambulatoria propuesto.

Por otro lado, de un análisis de la prueba desfilada durante el proceso, hemos podido apreciar que todas las determinaciones de hechos que hizo la oficial examinadora están sustentadas por la misma. Luego de haber examinado la totalidad del expediente ante nos, somos de la opinión que la parte recurrente no ha cumplido con el requisito imprescindible de identificar otra prueba en el expediente que reduzca el valor probatorio de la evidencia impugnada, ni ha demostrado que las conclusiones del oficial examinador fueron irrazonables de acuerdo con la totalidad de la prueba que tuvo ante su consideración.

En conclusión, en este caso, la decisión de la Secretaria de Salud de otorgarle el certificado de necesidad y conveniencia al CDT Dr. Caparrós fue razonable. No encontramos indicios de que su determinación no estuviera sostenida por la prueba contenida en la totalidad del expediente. Nada en la prueba documental o testifical que desfiló ante el Departamento nos hace siquiera sospechar que la determinación del Departamento fuera arbitraria o caprichosa. Más bien, entendemos que la determinación del Departamento fue producto del ejercicio legítimo de los amplios poderes, y principalmente, de la facultad discrecional que le confirió el legislador mediante la legislación pertinente para decidir a favor o en contra de la expedición de un certificado de necesidad y conveniencia.

Por los fundamentos antes esbozados, se confirma la resolución recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones